■ In the Matter of EXPRESS INDUSTRIES AND TERMINAL CORP.,
Appellant, v NEW YORK STATE DEPARTMENT OF TRANSPORTA-
TION et al., Respondents. [676 NYS2d 62] —Judgment, Supreme
Court, New York County (Herman Cahn, J.), entered on or
about June 3, 1997, which, *inter alia*, granted respondents' mo-
tion and cross-motion to dismiss the CPLR article 78 petition,
reversed, on the law, without costs, and the petition granted to
the extent of declaring the permit issued to petitioner to be
valid and enforceable.

Petitioner Express Industries and Terminal Corp. has been
the lessee of space situated at Pier 40 since the mid-1970s.
This matter arises out of negotiations for petitioner's continued
use of the pier following the expiration of its lease on December
31, 1996. On November 15, 1996, respondent New York State
Department of Transportation (DOT) sent petitioner four cop-
ies of a permit for use of the premises until December 31, 2000.
The permit provides for a total fee of $3.5 million and is cancel-
able only for violation of its terms and conditions. An ac-
companying letter to petitioner notes that the DOT "and the
Hudson River Conservancy have been in negotiations with you
for some time and the terms and conditions as stated in the
permit are the Department's final determination." It continues,
"Once the permits are signed by the Department a fully exe-
cuted copy will be sent to you."

Henry Mandel, president of petitioner, signed the permits on
November 18, 1996 and returned them to respondent on
November 26. It is uncontested that no alterations or deletions
were made to the permits, which were returned with a cover
letter signed by Ricky Mandel, petitioner's vice president. This
letter is the basis of respondents' contention that the permit is
unenforceable. It relates, in material part, "In conversations
with Mr. Vince McGowan of the Hudson River Conservancy,
certain aspects of the permit were under discussion", specifi-
cally, the exclusion of 70,000 square feet in the truck yard and
the necessity for a security deposit. The letter concludes, "Hope-
fully, when Mr. McGowan returns, we can resolve these two (2)
issues."

Rather than approve petitioner's permit, Richard J. Morris,

DOT's director of real-estate operations, replied by letter dated December 4, that the DOT "has received another offer to enter into a permit for the Pier 40 complex that is substantially higher than the amount set forth in the proposed permit you submitted November 26, 1996." The letter gave petitioner until 5:00 P.M. on December 5 to submit a "new offer". When Henry Mandel, petitioner's president, responded with a demand that DOT honor the permit, DOT executed a second permit for use of the premises in favor of respondent Pier 40 Operating, LLC, which was approved by Mr. Morris on December 5, 1996 at 5:08 P.M. The second permit contains the same essential terms but provides for a total fee of $4.5 million, instead of $3.5 million. Petitioner thereafter commenced this proceeding on December 12, 1996 by way of order to show cause and petition seeking to enforce the agreement formed with respondent. Respondent DOT then brought a motion to dismiss the petition predicated on a defense based upon documentary evidence, lack of jurisdiction and failure to state grounds upon which relief may be granted (CPLR 7804 [f]; 3211 [a] [1], [2], [7]), claims also advanced by respondent Pier 40 Operating, LLC by way of cross motion. Supreme Court granted the respective motions and dismissed the petition, ruling, "The November 26, 1996 letter was not an acceptance of DOT's offer, but instead constituted a counteroffer."

Resolution of this controversy turns on basic contract law, specifically, the concepts of offer and acceptance. At issue is whether the signing of the permit form and its return to respondent resulted in the formation of a valid agreement, thereby entitling petitioner to use the premises during the specified permit period.

A contract is simply a promise supported by consideration (*Curtis Props. Corp. v Greif Cos.*, 212 AD2d 259, 264), which arises, in the normal course of events, when the terms of an offer are accepted by the party to whom it is extended (*see*, Calamari and Perillo, Contracts § 11, at 13). "The offeror is the master of his offer" (Calamari and Perillo, Contracts § 30, at 45) and may specify what constitutes acceptance.

Two cases illustrate the scope of this doctrine. In *Fairmount Glass Works v Grunden-Martin Woodenware Co.* (106 Ky 659, 51 SW 196, 197 [1899]), a quotation of prices by a vendor was designated " 'for immediate acceptance' ". While a price list, circular or advertisement usually does not operate as an offer (*e.g., Schenectady Stove Co. v Holbrook*, 101 NY 45 [catalogue]), the court held that the quoted language evinced the intent to make an offer, which became binding upon acceptance by the

vendee. By contrast, in the case of *International Filter Co. v Conroe Gin, Ice & Light Co.* (277 SW 631 [Tex Commn App 1925]), a letter offering a filtration system stated that a contract would arise upon approval of the order by a corporate officer. While communication of acceptance is normally required to bind the parties to a contract (*e.g.*, *White v Corlies*, 46 NY 467), the court ruled that notice of acceptance was not necessary under the terms of the offer, which ripened into a contract upon signature by the plaintiff's president.

It is settled that where a contract is straightforward and unambiguous, its interpretation presents a question of law for the court, to be made without resort to extrinsic evidence (*West, Weir & Bartel v Mary Carter Paint Co.*, 25 NY2d 535, 540; *Eden Music Corp. v Times Sq. Music Publs. Co.*, 127 AD2d 161, 164). Unless the intention of the parties to be bound cannot be ascertained from the four corners of the permit, examination of the correspondence exchanged between petitioner and the DOT is unwarranted.

There seems to be no dispute that the permit itself constitutes an offer (the contention being whether petitioner has accepted it or made a counteroffer), and the terms of the permit support this construction. Above the signature of petitioner's president is the language: "ACCEPTANCE: In consideration of the granting of this permit, the undersigned accepts all of the above terms, conditions and provisions."

Two points deserve emphasis. First, petitioner's execution of the permit is expressly designated as an acceptance, supporting the consensus that the permit constitutes an offer. Second, should there be any doubt of petitioner's power to bind respondent to the terms of the offer, the provision recites that the grant of the permit is the consideration supporting petitioner's assumption of its obligations. Thus, the clear import of the language employed is that the permit has been granted and that petitioner, upon signing, accepts its terms and conditions.

In opposing petitioner's application for preliminary relief, respondent maintained that its permit does not become effective until signed by an official of the DOT. On appeal, it asserts that it "was not required, as Express argues, to spell out in the permit that execution by both parties, much less acceptance of all the terms, was a prerequisite for enforceability."

This argument is devoid of merit. As the master of its offer, respondent was free to condition the effectiveness of the permit upon signature by a DOT official (*see, International Filter Co. v Conroe Gin, Ice & Light Co., supra*). This it did not do. Instead, it sent petitioner a permit for its acceptance (*see, Fairmount*

*Glass Works v Grunden-Martin Woodenware Co., supra*), which thereby became binding upon signature. As the Appellate Division, Third Department, stated in *Keis Distribs. v Northern Distrib. Co.* (226 AD2d 967, 969), "if defendant had intended a more limited meaning for the agreement, then the burden was upon defendant, as the drafter of the document, to so specify and its failure to do so must not operate to plaintiff's detriment".

Respondent nevertheless contends that, despite petitioner's signature indicating its acceptance, the permit was not in fact accepted because the document contains several blanks in clauses claimed to be crucial and also because petitioner's letter accompanying the signed permit indicates a desire to continue negotiations regarding these issues. Respondent therefore characterizes the letter as a counteroffer that terminated the offer comprised by the permit.

It has long been established in law that a counteroffer operates as a rejection and termination of the offer (*Minneapolis Ry. v Columbus Rolling Mill*, 119 US 149 [1886]; *Sidney Glass Works v Barnes & Co.*, 86 Hun 374, 377 [1895]; *see also, Lambert v Kysar*, 983 F2d 1110, 1115 [1st Cir 1993]; *Gram v Mutual Life Ins. Co.*, 300 NY 375, 382-383 [1950]; Restatement [Second] of Contracts § 59), "unless the offeror or offeree manifests a contrary intention" (Calamari and Perillo, Contracts § 33 [d], at 60, citing Restatement [Second] of Contracts §§ 37, 38; *Quinn v Feaheny*, 252 Mich 526, 233 NW 403). To draw this conclusion, however, it is first necessary to determine if the offeree's proposal indeed constitutes a counteroffer, which is defined as "an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer" (Restatement [Second] of Contracts § 39 [1]).

The permit contains no date by which the requisite security deposit (equal to the permit fee for one month) must be received. Nor does the permit state that receipt of the security deposit is a condition precedent to its effectiveness. Assuming, for the sake of argument, that the permit would not be effective without a security deposit, petitioner had until December 31, 1996 to tender the specified amount to respondent. Petitioner's letter does not indicate its refusal to comply with this requirement, stating only the opinion that it is "unnecessary since the state DOT is paid in advance." In the absence of an absolute and unequivocal refusal to perform or a clear indication of the inability to do so, petitioner cannot be said to

have repudiated the permit and, thus, to have committed an anticipatory breach (*McCloskey & Co. v Minweld Steel Co.*, 220 F2d 101 [3d Cir 1955]). Respondent, however, vitiated petitioner's permit on December 5, 1996 when it approved the permit granted to Pier 40 Operating, LLC, thus obviating any need for further performance by petitioner. Furthermore, respondent's real-estate director, Richard Morris, averred that DOT's failure to honor the permit to petitioner was the result of receiving an "offer * * * that is substantially higher" and not any lack of compliance with the terms of the permit by petitioner. Significantly, the permit contains a provision for termination on ten days' notice for failure to make timely payments of the required fee.

Likewise, petitioner's statement in its cover letter of November 26, 1996 that the use of 70,000 square feet of space remains under discussion is not a contradiction of the terms of the permit. The permit indicates (at para 19) that "[t]he State is reviewing plans for the use of up to 70,000 sq. feet" and that it "reserves the right to remove such area from the premises" to devote to athletic events. The date by which notice of the State's need for such space must be given to petitioner is left blank. This, respondent asserts in opposition to the petition, indicates that there was no "meeting of the minds" as to a material term of the permit.

The permit accurately reflects the status of the 70,000 square feet of space as being subject to conditional exclusion from the premises. The failure of the DOT to specify a notice date is merely an ambiguity that, should the need to apply the space to an alternative use arise, will present an issue of fact for resolution at such time (*O'Neil Supply Co. v Petroleum Heat & Power Co.*, 280 NY 50, 55-56; *see also, Tobin v Union News Co.*, 18 AD2d 243, 245, *affd* 13 NY2d 1155). There is no valid reasoning by which this Court might invalidate an otherwise enforceable agreement because of a potential ambiguity with respect to an option that might never be exercised.

"In determining whether the parties intended to enter into a contract, an objective test is generally to be applied" (*Four Seasons Hotels v Vinnik*, 127 AD2d 310, 317). As various courts have observed, the intent of the parties to bind themselves to an agreement is to be garnered from its terms, and "it is such manifestation of the parties' intention, rather than actual or real intention, which controls" (*Conopco, Inc. v Wathne Ltd.*, 190 AD2d 587, 588, citing *Four Seasons Hotels v Vinnik, supra*, at 317; *Keis Distribs. v Northern Distrib. Co., supra*, at 968). As the Court of Appeals stated in *Brown Bros. Elec. Contrs. v*

*Beam Constr. Corp.* (41 NY2d 397, 399), "the existence of a binding contract is not dependent on the subjective intent of either [party] * * * In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look, rather, to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds" (citing *Mencher v Weiss*, 306 NY 1; *Homan v Earle*, 53 NY 267, 272).

Respondent has advanced no reason why petitioner's clear written acceptance, as contained in the permit, should be refused legal effect. Nor has respondent stated any basis for resort to extrinsic evidence to ascertain the respective obligations of the parties to the agreement. Moreover, even upon examination of petitioner's letter of November 26, 1996, argued by respondent to constitute a counteroffer, no contradiction of the terms of the permit is discernible.

Respondent's final contention is that mandamus is available only where the petitioner can demonstrate "a clear legal right to the relief sought" (*Matter of Legal Aid Socy. v Scheinman*, 53 NY2d 12, 16) and to compel the respondent to perform a ministerial act. Mandamus is not available, respondent contends, " 'to compel an act in respect to which the officer may exercise judgment or discretion' " (quoting *Klostermann v Cuomo*, 61 NY2d 525, 539). What respondent does not quote are the *Klostermann* Court's subsequent words: "What must be distinguished, however, are those acts the exercise of which is discretionary from those acts which are mandatory but are executed through means that are discretionary" (*supra,* at 539).

There is no question that respondent DOT may award a permit to one applicant over another, within the exercise of discretion. But having exercised its discretion to issue a permit for acceptance by a particular applicant, the agency is bound by its terms, upon such acceptance, to issue the permit as a matter of contractual obligation. This is not to suggest that the agency lacks discretion to decline to issue a permit submitted to it for approval, for good cause. However, the DOT has failed to suggest any reason why its tenant of some two decades is not worthy of approval as a licensee. In the absence of a demonstrated ground upon which approval of the permit might be rejected, what remains is the performance of a ministerial duty by respondent that the Court may compel (CPLR 7803 [1]). That petitioner might be able to assert a breach of contract action against the State should respondent fail to honor the terms of its permit does not deprive the Court of jurisdiction to entertain this proceeding and comprises no part of the relief

sought by petitioner. Concur—Rosenberger, J. P., Ellerin and Rubin, JJ.

Tom, J., dissents in a memorandum as follows: Since the 1970's, petitioner had been the lessee of premises on the ground floor of Pier 40 located at Houston and West Streets on the Hudson River. The most recent lease was due to expire in December 1996. By this time, the Department of Transportation (DOT) had promulgated a new policy pursuant to which only monthly permits would be issued for the pier. During 1996, petitioner and DOT negotiated for petitioner's lease of the entire pier. DOT made its offer in a letter dated November 15, 1996. The letter was accompanied by four copies of a monthly permit. The permit included as terms that a security deposit would be required and that the agency could opt to remove some 70,000 square feet from the rental, subject, of course, to a proportionate reduction of rent. The letter stated that the terms and conditions provided in the permit were DOT's final determination, and that petitioner was to sign and return the permit by November 27, 1996, if acceptable. Petitioner was also required to submit a security deposit of $291,700 to ensure faithful performance of the permit.

Petitioner returned the signed permits along with a cover letter dated November 26, 1996. However, the cover letter referred to these two issues as unresolved and still "under discussion." The responsive letter indicated that the security deposit should be unnecessary, and that exclusion of 70,000 square feet of rental space would create a hardship for petitioner's business operation. The permits were not executed by DOT. By letter dated December 4, 1996, DOT rejected what it construed to be a counteroffer, noting that it had received a better offer, but giving petitioner another opportunity to match the competing offer.

The existence of a binding contract centers upon the parties' intent to be bound and whether there was a meeting of the minds regarding the material terms of the transaction (*Martin Delicatessen v Schumacher*, 52 NY2d 105; *Central Fed. Sav. v National Westminster Bank*, 176 AD2d 131). Here, the financial terms of the agreement and the provision effectively defining the extent of the premises to be rented were material and substantial terms that went to the heart of the agreement (*see, Penn Palace Operating v Two Penn Plaza Assocs.*, 239 AD2d 155). Petitioner's concern over DOT's removal of certain areas from the permit was clearly manifested in its November 26th letter, which stated that exclusion of 70,000 square feet, proposed to be reduced from the truck yard, would impede

trucks backing into the platform and adversely impact on tenants, causing a loss of prospective tenants who would require that capability. Petitioner further indicated that the security deposit should not be required insofar as DOT would be paid in advance and the money could be better utilized for pier maintenance and improvements. Petitioner had failed to tender the requisite security deposit with the signed permits. The majority reads this not to be a condition precedent to acceptance. However, paragraph 5 concludes with the statement: "[t]he state *hereby acknowledges receipt*" (emphasis added) of the security deposit in the amount of $291,700, "received on _____, 1996." Although no date certain is included for tender of the security deposit, as noted by the majority, the very absence of a date, in the context of the preceding language of that sentence, leads to the clear indication that delivery was to accompany the signed permit, rather than the date of delivery constituting an independent term. Until the signed permit was actually sent back for execution, with the security deposit, the date of receipt could not be actually known. I fail to see how the payment of a security deposit in this substantial amount is not a material term of the agreement, or how one could assume that the date of delivery remained open-ended.

Hence, petitioner's responsive letter, which left open these material issues for further negotiations, cannot be construed to be an unambiguous and unequivocal acceptance of the terms contained in the offer (*King v King*, 208 AD2d 1143). Rather, petitioner's response was equivalent to a rejection and counteroffer. In other settings, when a purported acceptance has been even slightly at variance with the terms of the offer, we have characterized it as only a qualified acceptance, which we have construed to be a counteroffer rejecting the initially offered terms (*Homayouni v Banque Paribas*, 241 AD2d 375; *New York Yankees Partnership v SportsChannel Assocs.*, 126 AD2d 470). Here, DOT noted in its November 15th offer that the terms and conditions stated therein were DOT's "final determination", and thus not subject to modification or future negotiation. Nor is this a case where a possibly equivocal acceptance is salvaged by an additional assurance indicating that a term causing dissatisfaction is, nevertheless, accepted as proposed (*cf., John's Insulation v Siska Constr. Co.*, 671 F Supp 289).

I also reject petitioner's argument that DOT's December 4th letter premised its refusal to execute the permit only on the ground that another entity had made a higher bid, and not because DOT deemed petitioner's letter to constitute a

counteroffer. Contrary to petitioner's contention, DOT's letter explicitly stated that all the "terms and conditions contained within the previously tendered permit form remain the same," thus indicating a rejection of petitioner's counteroffer.

Since there was no meeting of the minds on material and essential provisions explicitly incorporated in the permit, there was no contract between the parties, and DOT remained free to entertain and accept competing bids.

Accordingly, I would affirm the judgment of the New York County Supreme Court dismissing the petition.