TEXAS INSTRUMENTS, INC., Plaintiff,

v.

HYUNDAI ELECTRONICS INDUSTRIES, CO. LTD., Hyundai Electronics America, Inc., and Hyundai Semiconductor America, Inc., Defendants.

Nos. 2:98CV73 TH, 2:98CV74 TH, 2:98CV77 TH, 2:98CV223 TH, 2:98CV224 TH, 2:98CV225 TH and 2:99CV1 TH.

United States District Court, E.D. Texas, Marshall Division.

Feb. 4, 1999.

662

Kenneth Robert Adamo, Jones Day Reavis & Pogue, Jay Carl Johnson, Texas Instruments Incorporated, Dallas, Carl R Roth, Law Office of Carl R Roth, Marshall, Barry Satine, Jones Day reavis & Pogue, Michael Covino, Jones Day Reavis & Pogue, New York, NY, for Texas Instruments Incorporated, plaintiffs.

Thomas John Ward, Brown McCarroll & Oaks Hartline, Longview, David J Beck, Beck Redden & Secrest LLP, Houston, TX, George Marcus Schwab, Mark T Jansen, Roger Cook, Townsend & Townsend & Crew, San Francisco, CA, Kenneth L Nissly, Thelen Reid & Priest LLP, San Jose, CA, for Hyundai Electronics Industries Co. Ltd., Hyundai Semiconductor America, Inc., Hyundai Electronics America, Inc., defendants.

Elizabeth Ellen Mack, Locke Purnell Rain Harrell, Dallas, TX, Anthony de Al-cuaz, Howard Rice Nemerowski Canady, Palo Alto, CA, for Nikon Precision Inc., movant.

Roderick M. Thompson, Pillsbury Madison & Sutro, San Francisco, CA, for DNS Electronics, LLC.

## MEMORANDUM AND OPINION ORDER

HEARTFIELD, District Judge.

Before this court is Plaintiff *Texas Instruments Incorporated's Motion for Partial Summary Judgment and Memorandum in Support Thereof*[1] [83, 84, and 85 of 2:98–cv–74] and Defendant *Hyundai's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment*[2] [67 of 2:98–cv–73]. Having considered the motions, the replies, the sur-replies, the arguments of counsel, and the pleadings on file, this Court hereby GRANTS Plaintiff *Texas Instruments Incorporated's Motion for Partial Summary Judgment and Memorandum in Support Thereof* [83, 84, and 85 of 2:98–cv–74] and DENIES Defendant *Hyundai's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment* [67 of 2:98–cv–73].

### 1. The Extensive History Between Texas Instruments and Hyundai

A. Texas Instruments and Hyundai—The Parties Forge a Relationship

As stated earlier, this lawsuit represents merely the tip of the litigation iceberg between Texas Instruments and Hyundai.

1. Civil Action No. 2:98–cv–74 is merely the tip of the litigation iceberg between Texas Instruments and the Hyundai entities. There are currently seven lawsuits pending in this Court between these parties: Civil Action Nos. 2:98–cv–73, 2:98–cv–74, 2:98–cv–77, 2:98–cv–223, 2:98–cv–224, 2:98–cv–225, and 2:99–cv–1. While Texas Instruments filed its motion in Civil Action No. 2:98–cv–74, it has asked this Court to apply it in every case pending before this Court in which Hyundai has raised the affirmative defense of license. It will. Thus, Texas Instruments' motion for partial summary judgment shall apply in Civil Action Nos. 2:98–cv–73, 2:98–cv–74, 2:98–cv–77, 2:98–cv–223, 2:98–cv–224, 2:98–cv–225, and 2:99–cv–1.

2. While Texas Instruments has asked its motion to apply across the board to all currently pending cases in this Court between Texas Instruments and the Hyundai entities, Hyundai has filed its motion in Civil Action No. 2:98–cv–73 "seeking summary judgment or, in the alternative, partial summary judgment on their counterclaims for declaratory relief against Texas Instruments Incorporated ("TI") in Case No. 2:98–cv–73 and on their Fifth Affirmative Defense in Case Nos 2:98–cv–74 and 2:98–cv–77 pursuant to Federal Rule of Civil Procedure 56." *Hyundai's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment* at 1 *("Hyundai's Motion for Summary Judgment")*.

In order to rule on the parties' summary judgment motions, it is incumbent upon this Court to track the events between Hyundai[3] and Texas Instruments, Incorporated ("Texas Instruments") that led up to this pivotal point in Marshall, Texas.[4] First of all, these parties are not strangers to the Eastern District of Texas, Marshall Division. In September 1992, Texas Instruments filed a patent-infringement lawsuit against Hyundai in this very Court. However, on April 26, 1993, Texas Instruments and Hyundai settled that lawsuit by entering into a patent cross-license agreement.[5] The fifty-five (55) page agreement—aptly titled the "License Agreement"—granted Hyundai freedom to use certain Texas Instruments patents (even those issued after the effective date of the license) around the world. It also granted Texas Instruments similar freedom to use Hyundai's patents around the world. Pursuant to the License Agreement, Hyundai agreed to pay Texas Instruments royalties subject to specified caps. Although both parties were able to come to terms with the fifty-five page contract, all good things must come to an end.

The License Agreement consists of two "periods." Under Article 5.1 of the agreement, the "First Period" ended on December 31, 1995. *License Agreement* at 29 Under Article 5.2 of the license agreement, the "Second Period," the current period in dispute, began on January 1, 1996 and terminates either upon December 31, 2000 or when "cumulative worldwide sales of ROYALTY BEARING PRODUCTS"[6] reaches three billion eight hundred ninety-five million and one hundred thousand U.S. dollars (U.S.$3,895,100,000) (the "sales cap").[7] *License Agreement* at 30. Obviously, December 31, 2000 is not here. Thus, the crux of the present dispute is whether Hyundai's cumulative worldwide sales of semiconductive elements and semiconductive apparatus (other than discrete devices) for the period commencing on January 1, 1996, have indeed reached the sales cap of $3,895,100,000.[8] Regardless of

3. This Court will use "Hyundai" to refer collectively to the three defendants: 1) Hyundai Electronics Industries Company, Limited, 2) Hyundai Electronics America, Incorporated, and 3) Hyundai Semiconductor America, Incorporated. For the limited purposes of this opinion, there is no need to distinguish between these three Hyundai entities.

4. In its motion for the Judicial Panel of Multidistrict Litigation to transfer the New York action (discussed later) to Multidistrict Litigation, Hyundai described this Court as one of those "notoriously rapid jurisdictions such as the Eastern District of Virginia and Marshall, Texas (a remote court in East Texas with a visiting judge from 200 miles away)." *Hyundai's Notice of Motion* at 5. In fact, we are only 190 miles away from Marshall, Texas; and with the recent invention of that "notoriously rapid" contraption coined the "automobile," we are able to get here in a little over three hours.

5. Both parties admit they entered into the patent cross-license agreement so that there would be "no chance of litigation or controversy during the term of the agreement." *See Hyundai's Motion for Summary Judgment* at 3. Well, hope springs eternal.

6. The contract defines "royalty bearing products" in Article 1.21: " 'ROYALTY BEARING PRODUCTS' means *items (c) and (d) set forth in Article 1.20*, however, ROYALTY BEARING PRODUCTS shall not mean SEMICONDUCTIVE ELEMENTS, or SEMICONDUCTIVE APPARATUS, which are discrete devices such as transistors, photo transistors, diodes and SCRs" *License Agreement* at 12 (emphasis added). Obviously, via the emphasized language noted above, Article 1.21 refers to a portion of Article 1.20. *See infra* pp. 27—28.

7. The parties reach this amount by taking "an amount equal to the product of one and one-tenths (1.1) multiplied by three billion five hundred forty one million United States dollars (U.S.$3,541,000,000.00)." *License Agreement* at 30. This Court can discern no reason why the parties didn't just say "$3,895,100,000.00."

8. Obviously, the sales cap lies at the heart of the present dispute. Why did the parties inject this "sales cap" feature into an already complicated contract? *Texas Instruments* was concerned that Hyundai's sales would increase faster than anticipated at the time of negotiations. In order to insure Texas Instruments would have the opportunity to negotiate a fair royalty in the event of extraordinary Hyundai growth, both parties agreed that the license would automatically terminate if Hyundai's cumulative worldwide sales

the amount of sales to date, Texas Instruments and Hyundai realized the need to begin license renewal negotiations.

## B. Renewal Negotiations—Friendly Discussions Begin

### 1. The Fundamentals of Semiconductor Chip Patent Negotiations

On May 15, 1997, Texas Instruments and Hyundai began renewal negotiations with the exchange of their "proud lists." Apparently, "proud lists" are representative lists of patents that each company believes are particularly applicable to its negotiating partner's business and products.[9] Well, why not just list the specifically covered patents and be done with it? Welcome to the wild world of semiconductor technology patent negotiations. Semiconductor devices are tiny silicon chips about one-half the size of a thumbnail which contain over sixty million transistors. These chips are now manufactured with tolerances between electrical circuits as close as .18 microns.[10] They can literally store an encyclopedia of information. However, it is exceedingly difficult to determine whether a semiconductor chip infringes upon any patent without "reverse engineering" the device—a costly and time-consuming endeavor. Moreover, semiconductor chips are easily transferrable and difficult to track. Finally, large companies like Texas Instruments and Hyundai have thousands of patents around the world, with so many patents worldwide, it is quite possible for Texas Instruments and Hyundai to have multiple pat-

ents maturing and expiring every day.[11] Thus, parties like Texas Instruments and Hyundai when drafting a license agreement do not negotiate a single contract for a single patent for a single product. For although such a highly specified endeavor would undoubtedly yield certainty as to which patent is covered by the contract, it would not provide the expansive patent coverage sought by both parties. So, parties like Texas Instruments and Hyundai turn to broad, portfolio-like cross-license agreements such as the one currently in dispute before this Court In order to accommodate the large size of companies and the fluid nature of semiconductor patent technology, these cross-license agreements usually include patents that come into existence after execution of the contract. By using this expansive cross-license agreement procedure, mammoth companies like Texas Instruments and Hyundai avoid the costly and inefficient endeavor of a patent-by-patent licensing scheme.[12]

### 2. Standstill Agreements Extend License Negotiations

So, beginning in March of 1997, Texas Instruments and Hyundai agreed to conduct license renewal negotiations without resort to litigation through a "standstill agreement" that would expire in mid-February 1998. Texas Instruments argued that the License Agreement terminated in late 1997 when, according to Dataquest's[13] calculations, the sales cap had been reached. On January 20, 1998 during a

reached a certain amount. Simply put, Texas Instruments (quite understandably) did not want to lock itself into a runaway contract. Texas Instruments was not the only one concerned about Hyundai's growth. Hyundai itself enjoys similar protection from its own growth since its royalties are "capped" and cannot exceed specified amounts each year.

9. These proud lists serve as a starting point for license negotiations and are not an exhaustive list of patents owned by each party. On the contrary, negotiating parties often add patents to and remove patents from their proud lists during the course of negotiations.

10. For those non-Star Trekkers, a micron is 1/77th the width of a human hair.

11. For example, Texas Instruments currently owns about 4,000 semiconductor patents and has an equal number of patent applications pending worldwide.

12. They also open themselves up to various interpretations of the cross-license agreement; the very reason this Court writes today.

13. Apparently, Dataquest is a service capable of making such calculations in the high-tech field of semiconductor technology.

negotiation session, Hyundai proffered its argument why it believed (and continues to believe) the sales cap has in fact *not* been reached. Hyundai argued (for the first time according to Texas Instruments) that not all of its sales are to be counted in calculating the sales cap Specifically, Hyundai argued that the License Agreement provided that only products covered by the claim of a Texas Instruments patent count toward the sales cap. In essence, Hyundai told Texas Instruments that "royalty bearing products" (products which count toward the sales cap) were limited to products which practice a Texas Instruments patent, in force at the time the product is sold, in the country in which the sale occurs (the "TI Countries"). Hyundai conceded that TI Countries included the United States, Canada, and several European countries [14] which it "credited" to the sales cap calculation. Through the end of April of 1998, Hyundai credited $3,002,140,000 in sales in these "TI countries" toward the sales cap calculation, thereby placing Hyundai roughly $900,000,000 under the sales cap. But these were not all of Hyundai's sales. Hyundai argued that the following countries were (and still are) "Non–TI Countries" whose sales are *not* applicable to the sales cap calculation: Australia, Brazil, China, Hong Kong, India, Israel, Korea, Malaysia, Philippines, Malta, Russia, Singapore, Thailand, Turkey, and Taiwan.[15] Under Hyundai's interpretation of the License Agreement, Texas Instruments would not receive credit toward the sales cap calculation for products sold in these "Non–TI Countries." However, had Hyundai included all of these "Non–TI Countries" in its calculation of the sales cap, then, by its own calculations under its own interpretation of the License Agreement, its total worldwide sales of royalty bearing products would have been $4,521,528,000 by April 1998—far over the termination cap of $3,895,100,000.[16] At Hyundai's request, Texas Instruments agreed to two extensions to this standstill agreement. On May 1, 1998 the last extension to the standstill agreement expired. Negotiations had failed.[17] C. A Global Litigation War

Since negotiations failed, Texas Instruments and Hyundai turned to the courts; in fact, they turned to a myriad of courts across this nation and around the world.

### 1. United States Litigation—The American Offensive

May 1, 1998 was a busy day for the parties' attorneys, for both Texas Instruments and Hyundai filed lawsuits on this day. On May 1, 1998 Texas Instruments

---

**14.** The European countries where Hyundai "credits" sales of products toward the sales cap calculation include Belgium, the United Kingdom, Germany, France, "Deutch" (presumably the Netherlands), and Scotland. Hyundai concedes that sales of products in these countries are applicable to the sales cap calculation. *See infra* note 16.

**15.** Under its own royalty-bearing-product cap calculations, Hyundai specifically referred to these "Non–TI Countries" as "ROW" countries, or "rest-of-world" countries. Once again, under Hyundai's "TI Country Concept" interpretation of the License Agreement, these "ROW" countries (or "Non–TI Countries") do *not* apply to the sales cap calculation. However, if you include these "Non–TI Countries" or (" 'ROW' countries") in the sales cap calculation, then, under Hyundai's own calculations it had exceeded the sales cap as of the end of April 1998. *See infra* note 16.

**16.** All of these calculations and concessions are taken from a Hyundai document entitled "TI License Expiry Simulation ('98 4 Actual for Semi/'98 5 Plan for Memory)," part of Hyundai's internal records. Hyundai's representative, Mr. M.B. Chung, identified this document, among others, as a "royalty bearing product cap or sales simulation." Interestingly, Webster's Dictionary defines "expiry" as "a. exhalation of breath; b. death; c. *termination; esp.: the termination of a time or period fixed by law, contract, or agreement.*" *Meridian Webster's Collegiate Dictionary* 10th ed (emphasis added). If this Court includes Hyundai's "Non–TI Countries" or "ROW" countries in its calculation of the sales cap, then, under Hyundai's own interpretation and its own calculations (found within the aforementioned, Hyundai document) it has indeed exceeded the sales cap as of May 1, 1998.

**17.** Gentlemen, start your lawyers...

**666**

filed three patent suits against Hyundai in two judicial districts. In the Eastern District of Virginia, Texas Instruments filed Case No. 98–627–A.[18] asserting synchronous dynamic random access memory ("DRAM") patents against Hyundai's DRAM products that continue to be at issue in litigation between NEC and Hyundai in that court. On that same day, Texas Instruments filed two more patent suits against Hyundai in this Court. In Case No. 2:98–cv–73 Texas Instruments asserted memory process and structure patents against Hyundai.[19] In Case No. 2:98–cv–

74 Texas Instruments asserted manufacturing process patents against Hyundai.[20]

On that same busy day—May 1, 1998—Hyundai filed a declaratory judgment action in the Southern District of New York (Case No. 98 Civ. 3118) (the "New York Action"). In the New York Action, Hyundai sought a defensive declaration that the License Agreement had not terminated; and, as a result, it was not infringing upon Texas Instruments' patents.[21] On May 6, 1998 Hyundai struck back. First, Hyundai filed two patent infringement actions

18. On October 9, 1998 the District Court for the Eastern District of Virginia granted Hyundai's motion to transfer this case to this Court. Virginia case number 98–627–A now bears case number 2:98–cv–225 in this Court. In this particular case, Texas Instruments alleges Hyundai has infringed and continues to infringe seven of its patents: its '370 patent which protects an invention of a synchronous dynamic random access memory device having a control data buffer; its '369 patent which protects an invention of a synchronous dynamic random access memory device; its '367 patent which protects an invention of a process for controlling writing to a dynamic random access memory array; its '358 patent which protects an invention of a system transferring streams of data; its '954 patent which protects an invention of a random access memory arranged for operating synchronously with a microprocessor and a system including a data processor, a synchronous dynamic random access memory, a peripheral device, and a system lock; and its '721 patent which protects an invention of a memory apparatus with random and sequential addressing. *Complaint, 2:98–cv–225* at 2–7.

19. Specifically, Texas Instruments alleges Hyundai has infringed and continues to infringe two of its patents: its '075 patent which protects an "invention of a random access memory cell with implanted capacitor region," and its '781 patent which protects "inventions of a semiconductor device with electrostatic discharge protection." *Complaint for Patent Infringement, 2:98–cv–73* at 2–3.

20. Specifically, Texas Instruments alleges Hyundai has infringed and continues to infringe its '674 and '613 patents which protect its "inventions in segmented asynchronous operation of an automated assembly line." *Complaint for Patent Infringement, 2:98–cv–74* at 2–3

21. AS a plaintiff in the New York court, Hyundai didn't fare so well:

> Furthermore, it is this Court's opinion that, in view of Plaintiff's refusal to engage in the discovery previously agreed upon, Hyundai's main purpose in filing this action was to delay the adjudication of the claims pending elsewhere... Given Plaintiff's delay of the agreed upon discovery in the instant case, completion of the contemplated discovery by the order's October 1 deadline is impossible or will impose undue burdens on opposing counsel. Meanwhile, it appears that Hyundai may continue to receive the benefit of royalty-free sales of infringing products. Plaintiff's actions, as Judge Rakoff pointed out when he granted the order to show cause on August 24, 1998, "make a total mockery of [this Court's] order" and constitute a failure to participate in good faith in discovery ordered by the Court.
>
> For all these reasons, dismissal is a remedy of appropriate severity, without being unduly prejudicial to Plaintiff's interests.
>
> Accordingly, the complaint will be dismissed *with prejudice.* Defendant is to submit an Order of Dismissal with notice to Plaintiff.

*Opinion and Order 98 Civ. 3118 (New York District Court)* at 2–3 (emphasis added). This Court later found Judge Patterson's dismissal of Hyundai's declaratory action to be a dismissal *without* prejudice as to the license issue being litigated in other jurisdictions. As a result of this finding, this Court permitted Hyundai to amend its answer in the 2:98–cv–73 case to include a counterclaim for· the declaratory relief dismissed by the New York court (Although the Joint Panel on Multi-District Litigation refused to consolidate all of these cases, it soon became apparent that Marshall, Texas was going to become the *de facto* MDL court as Texas Instruments cases, Hyundai cases, and parts of both began to trickle, and then flow, into this Court).

against Texas Instruments, both in the Eastern District of Virginia (Case Nos. 98–647–A and 98–648–A).[22] On that same day, Hyundai filed yet another pair of patent infringement actions against Texas Instruments—one in this Court (Case No. 2:98–cv–77),[23] and one in the District of Delaware (Case No. 1:98–251).[24] Finally, Hyundai's guns have once again fired in this Court—this time with Case No. 2:99–cv–1 against (none other than) Texas Instruments.[25] Hyundai tells this Court it

22. Once again, on October 9, 1998, the District Court for the Eastern District of Virginia granted Hyundai's motion to transfer these cases to this Court. Virginia case number 97–647–A now bears case number 2:98–cv–223 in this Court; Virginia case number 98–648–A now bears case number 2:98–cv–224 in this Court. The Virginia Court's October 9, 1998 transfer order terminated its participation in this particular litigation between Texas Instruments and Hyundai (alas, the first battlefield falls silent as the forces converge in Marshall, Texas). In the 2:98–cv–223 case, Hyundai alleges Texas Instruments has infringed and continues to infringe its '323 patent which protects "an invention entitled 'Power Supply Compensated MOS Schmitt Trigger Oscillator' " and its '528 patent which protects "an invention entitled 'Data Output Buffer' " *Amended Complaint for Patent Infringement, 2:98–cv–223* at 2–3. In that same case, Texas Instruments counterclaims that Hyundai has infringed and continues to infringe its '422 patent which protects an invention of a power up detection circuit, and its '228 patent which protects an invention of a memory decoding circuit. *Texas Instruments Incorporated's Answer to Plaintiff's First Amended Complaint and Counterclaim, 2:98–cv–223* at 4–5. In the 2:98–cv–224 case. Hyundai alleges Texas Instruments has infringed and continues to infringe its '416 patent which protects an invention entitled "Method for Fabricating In–Situ Doped Polysilicon Employing Overdamped Gradually Increasing Gas Flow Rates with Constant Flow Rate Ratio," its '265 patent which protects an invention entitled "Method for Removing Residual Material From a Cavity During the Manufacture of a Semiconductor Device by Utilizing Plasma Scattering," its '831 patent which protects an invention entitled "Method for Making Low Resistance Polysilicon Gate Transistors and Low Resistance Interconnections Therefore Via Gas Deposited In–Situ Doped Amorphous Layer and Heat–Treatment," and its '355 patent which protects an invention entitled "Bipolar Transistor Construction." *First Amended Complaint, 2:98–cv–224* at 2–5. In this case, Texas Instruments counterclaims that Hyundai has infringed and continues to infringe its '160 patent which protects an invention of a computer including an integrated circuit having a low power selection control arrange-

ment and its '030 patent which protects an invention of self refresh circuit for dynamic memory. *Texas Instruments Incorporated's Answer to Plaintiff's First Amended Complaint and Counterclaim, 2:98–cv–224* at 6–8.

23. In this particular case, Hyundai alleges that Texas Instruments has infringed and continues to infringe three of its patents—its '31! patent which protects an invention entitled "Method for Manufacturing a Conductor Layer in a Semiconductor Device," its '088 patent which protects an invention entitled "Group Coding for Serial Data Transmission," and its '995 patent for an invention entitled "Process for Anisotropically Etching Semiconductor Material." *Complaint, 2:98–cv–77* at 1–3 (Just so everyone is clear, Webster defines "anisotropically" as "exhibiting properties with different values when measured in different directions.") *Webster's, supra* In this case, Texas Instruments counterclaims that Hyundai has infringed and continues to infringe its '041 patent which protects an invention of a source contact placement for efficient ESD/EOS protection in grounded substrate MOS integrated circuit and its '874 patent which protects an invention of a matrix interconnection system with different conductors. *Texas Instruments Incorporated's Answer to Plaintiff's Complaint and Counterclaim, 2:98–cv–77* at 5–6.

24. As a result of the completion of Texas Instruments' sale of its dynamic random access memory (DRAM) business to Micron, Hyundai has moved to dismiss its complaint against Texas Instruments, without prejudice, on October 16, 1998. *Texas Instruments has* opposed this motion, requesting that Hyundai's complaint be dismissed with prejudice, that Hyundai not be permitted to bring a motion to transfer a counterclaim to this Court, and that Texas Instruments recover its costs. The motion is still pending before that honorable court (and yet another battlefield is poised to fall silent as the lawyers board planes for Marshall, Texas).

25. In this most recently filed case, Hyundai alleges that Texas Instruments has infringed and continues to infringe another one of its patents—its '393 patent which protects an invention entitled "Monolithic Discrete–Time

filed these cases because it "could not allow itself to be put at a strategic disadvantage while TI filed patent actions in well-recognized rapid jurisdictions such as the Eastern District of Virginia." *Hyundai's Motion for Summary Judgment* at 9.

### 2. Foreign Litigation—The International Campaign

Texas Instruments and Hyundai did not confine their dispute to the United States courts; in fact, the Texas Instruments and Hyundai litigation landing crafts washed lawyers upon foreign shores around the world. First red-light stop was in the Netherlands where, on May 1, 1998, Texas Instruments sued Hyundai and several other entities for patent infringement in Case No. 98/2175.[26] Next beach-head was in England where, on May 5, 1998, Texas Instruments sued Hyundai Electronics UK Ltd. for patent infringement in Case No. CH 1998 T. No. 2532.[27] The litigation forces then landed in Japan where, on May 6, 1998, Texas Instruments sued Hyundai Electronics Japan K.K. for patent infringement in Case No. (Yo) 22075.[28] Next, the forces moved into Germany, where, on May 12, 1998, Texas Instruments sued Hyundai Electronics Deutschland GmbH and H.K. Yoo, Managing Director of Hyundai Electronics Deutschland GmbH for patent infringement in Case No. 4 O 166/98.[29] Finally, the Texas Instruments contingent marched into France where, on May 15, 1998, it sued Hyundai Electronics UK Ltd. and Hyundai Electronics Industries Company, Ltd, alleging patent infringement in Case No. 98/10908.[30]

The Netherlands, England, Japan, Germany, France—all of these countries share one commonality via this litigation: the license issue. In each of these countries Hyundai has challenged jurisdiction based upon their "TI Country Concept" interpretation of the License Agreement. Moreover, Hyundai has requested each of these courts to defer to this Court's ruling on the contract issue. Of course, this Court can not "bind" these foreign courts with its license determination (nor would it presume to do so). Nevertheless, with the trial of Texas Instruments' first patent infringement case nearing, the time has come for this Court to rule on the license issue. This Court remains ever mindful of the implications its decision may have on the foreign litigation and will endeavor to perform an adequate analysis of the li-

Digital Convolution Circuit." *Complaint,* 2:99–cv–1 at 2.

26. The other entities sued by Texas Instruments include Hyundai Electronics Deutschland GmbH, Hyundai Electronics UK Ltd., Oakwood Semiconductor BV, Oakwood Electronics BV, and Aeon Technology BV. Apparently, discovery as it is conducted in the United States does not occur in the Netherlands. Rather, the parties exchange and submit to the Dutch court evidence and pleadings in advance of the one-day trial. The Dutch action currently has a February 5, 1999 trial setting; and the Dutch court will probably render its decision within six weeks of that trial date.

27. Discovery is now in progress in the English action; and written expert submissions were scheduled to be filed December 22, 1998. The English action currently has either an April 5, 1999 trial setting or an April 14, 1999 trial setting (the parties appear to diverge on this issue); regardless, the English trial is scheduled to last about two weeks before Lord Justice Pomphrey.

28. The parties are currently exchanging briefs as requested by the Japanese court. It appears that the Japanese court will determine the patent infringement issues first and then turn to the licensing issue. The parties expect the Japanese court to rule on the requested injunctive relief some time during the summer of 1999.

29. Like Dutch procedure, German procedure does not provide for discovery; however, the parties are currently exchanging evidence and will have the opportunity to file additional briefs. Hyundai states that the German action currently has a May 6, 1999 trial setting, while Texas Instruments submits there currently is no trial setting for the German action.

30. Like Dutch and German procedure, French procedure does not provide for discovery; however, French law does permit seizure of an alleged infringer's product. Thus, Hyundai's product has indeed been seized pursuant to French law. Currently, there is no trial date for the French action.

cense issue. This Court now turns to the summary judgment standard and then, alas, to the license issue currently before it.

## 2. Summary Judgment Standard

Rule 56(b) of the Federal Rules of Civil Procedure states: "A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). Furthermore, Rule 56(c) states, in part: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, summary judgment is proper when, after a reasonable period for discovery, one party is unable to show a genuine issue as to a material fact on which he will bear the burden of proof at trial, provided that judgment against him is appropriate as a matter of law. *Nebraska v. Wyoming*, 507 U.S. 584, 589, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex, id.* The moving party need not negate the elements of the non-moving party's case. *Id.* at 323, 106 S.Ct. 2548; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (citing *Celotex, id.*, and *Lujan v. National Wildlife Fed'n.*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Rather, the moving party need only "demonstrate the absence of a genuine issue of material fact." *Celotex, id.*

The non-moving party does not overcome the absence of a genuine issue of material fact by simply "creating some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), by making "conclusory allegations," *Lujan, supra* at 871–73, 110 S.Ct. 3177, by presenting "unsubstantiated assertions," *Little, supra* at 1075, or by proffering only a "scintilla" of evidence. *Id.* When the non-moving party fails to make a sufficient showing on an essential element of his case, the moving party is entitled to a judgment as a matter of law. *Ibid.* Nonetheless, when considering a motion for summary judgment, the trial court must construe all evidence in the light most favorable to the non-moving party and resolve all doubts against the moving party. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), *cert. denied*, —— U.S. ——, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998).

Both Texas Instruments and Hyundai urge this Court to adopt differing interpretations of the License Agreement—a fifty-five page contract they entered into on April 26, 1993. Under Article 9.10 of that agreement, the parties agreed that New York law shall apply to the License Agreement's construction, interpretation, and application.[31] Interpretation of a contract, including the question of whether the contract is ambiguous, is a question of law. *Reid v. State Farm Mut. Auto. Ins.*, 784 F.2d 577, 578 (5th Cir. 1986). Summary judgment is particularly appropriate in cases where the language of a contract is unambiguous and only the interpretation of the contract in light of state substantive law is in dispute. *Burns v. Exxon Corp.*, 158 F.3d 336 (5th Cir. 1998); *Bartle v. Travelers Ins. Co.*, 171

---

**31.** Article 9.10 of the License Agreement reads, in its entirety: "This Agreement and matters connected with the performance thereof shall be construed, interpreted, applied and governed in all respects in accordance with the laws of the State of New York, United States of America, applicable to agreements made and to be performed entirely within that state." *License Agreement* at 52.

F.2d 469, 471 (5th Cir.1948). This interpretation by the court "includes a determination as to a contract's facial ambiguity." *Id.* Nonetheless, ambiguity of a contract does not preclude a summary judgment ruling by the court.

> Summary judgment is appropriate in a contract interpretation dispute whenever there is no genuine issue of fact, a situation that obtains not only when the language is unambiguous, but also when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law.

*NYCAL Corp. v. Inoco PLC,* 988 F.Supp. 296, 299 (S.D.N.Y.1997) (footnote and citations omitted).

### 3. Compliance With Local Rule CV–56

■ Before this Court even gets into the text of their briefs, the parties have managed to raise a significant controversy. Hyundai urges this Court to dismiss Texas Instruments' motion (in its entirety) since Texas Instruments' motion "fails to submit a 'Statement of Material Facts' as required under Local Rule CV–56(a)." *Hyundai's Opposition to Texas Instruments Incorporated's Motion for Partial Summary Judgment ("Hyundai's Opposition Brief")* at 5. Local Rule CV–56(a) reads, in part: "The text of a motion or an appendix thereto must include a 'Statement of Material Facts.'" *See Local Rule CV–56(a).* Local Rule CV–56(b) reads, in part: "Any party opposing the motion should serve and file a response that includes in the text of the response or as an appendix thereto, a 'Statement of Genuine Issues.'" *Id.* at *CV–56(b).* Finally, Local Rule CV–56(c) reads, in part: "In resolving the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the 'Statement of Genuine Issues' filed in opposition to the motion, as supported by proper summary judgment evidence." *Id.* at *CV–56(c).*

Initially, Texas Instruments failed to submit a "Statement of Material Facts" in compliance with these local rules. However, after Hyundai made the afore-mentioned argument that Texas Instruments therefore admitted Hyundai's "undisputed" statement of genuine issues, Texas Instruments separately filed its "Statement of Genuine Issues." Furthermore, Texas Instruments included, in its *Brief of Texas Instruments Incorporated's in Support of its Motion for Summary Judgment,* identified factual and legal issues, together with supporting record citations raised by Hyundai's motion. *See Texas Instruments Statement of Genuine Issues* at 1. While Texas Instruments' may have technically satisfied the local rule (and this Court makes no finding that is has), the simultaneous supplementation of the record with a "Statement of Genuine Issues" appears to render this skirting of the local rule harmless in this particular case. However, this case is a complex patent infringement lawsuit involving highly complicated semi-conductor technology; moreover, it involves complex contract issues touching on litigation now pending in other cases in this Court, in other courts in this nation, and in foreign courts around the world. In complex cases like these, mere technical compliance with Local Rule CV–56 simply fails to aid the Court in resolution of the issues before it. Although Texas Instruments should have initially filed its "Statement of Material Facts," this Court finds that its reply brief, coupled with the supplementation of the record with a "Statement of Genuine Issues," renders this skirting of the local rule harmless. No prejudice was occasioned upon Hyundai, particularly since the parties' motions involve mostly *legal* and not *factual* issues.

### 4. Article 5.2(A)(ii) of the License Agreement—The Center of the Dispute

Texas Instruments argues the License Contract has terminated; Hyundai says it has not. Thus, this Court begins its analysis with the "Term & Termination" Article

of the License Agreement. Article 7.1 reads, in part: [32]

> Except as otherwise provided in Article 7, this Agreement and the license granted pursuant hereto shall remain in force until December 31, 2000; *unless the Second Period terminates according to (ii) of Article 5.2(A),* in which case this Agreement and the licenses granted pursuant hereto shall terminate upon termination of the Second Period, provided, however, any obligation on the part of HEI to pay to TI any sums under Article 5.2(B) of this Agreement, shall survive such termination.

*License Agreement* at 39 (emphasis added).

Article 5.2(A)(ii) of the License Agreement is the tinderbox that ignited this global litigation war between Texas Instruments and Hyundai. It's what this fight is all about. Article 5.2(A) reads, in its entirety:

> In consideration for the licenses granted hereunder by TI to HEI during the period ("Second Period") commencing on January 1, 1996, and ending upon the first to occur of:
>
> (i) December 31, 2000; or
>
> (ii) *HEI's cumulative worldwide sales of ROYALTY BEARING PRODUCTS during the Second Period reaching an amount equal to the product of one and one-tenths (1.1) multiplied by three billion five hundred forty one million United States dollars (U.S.$3,541,000,000);*
>
> HEI shall pay to TI royalties in United States dollars, at a rate of eight percent (8%) of the NET SALES BILLED of all ROYALTY BEARING PRODUCTS used, leased, sold or otherwise disposed of by HEI or its SUBSIDIARIES, dur-

ing each calendar year of the Second Period, the amount payable, in each calendar during the Second Period, not to exceed the following annual maximum amounts:

| Year | Annual Maximum |
|------|----------------|
| 1996 | U.S. $15,000,000 |
| 1997 | U.S. $15,000,000 |
| 1998 | U.S. $17,000,000 |
| 1999 | U.S. $18,000,000 |
| 2000 | U.S. $18,000,000 |

*License Agreement* at 30 (considerable emphasis added). This is the "sales cap" provision. Texas Instruments says the sales cap has been reached and the contract has terminated. Hyundai says the opposite—that the sales cap has not been reached and thus the contract was still in effect when Texas Instruments filed its initial patent infringement lawsuits.[33] The answer lies in the proper interpretation of this provision.

### 5. Applicable State Contract Law Subject to Federal Patent Laws

■ As previously stated, pursuant to Article 9.10 of the License Agreement, the parties agreed that New York law shall apply to the License Agreement's construction, interpretation, and application. Thus, this Court must apply New York substantive law in performing its summary judgment analysis of the License Agreement. Although Texas Instruments and Hyundai stipulated in the License Agreement that New York law would govern the construction, interpretation, and application of the License Agreement, New York law may not preempt or violate federal patent laws which remain the supreme law of the land. *Fantastic Fakes v. Pickwick Intern.,* 661 F.2d 479, 483 (5th Cir., Unit B 1981) ("A choice of law provision, there-

---

32. This Court will later revisit another portion of Article 7.1 when it considers Hyundai's "good-faith" argument supporting its "TI Country Concept" interpretation. For now, this Court is strictly concerned with *how* the contract terminates.

33. Hyundai further argues that since the License Agreement was still in effect at the time

Texas Instruments filed its lawsuit, Texas Instruments committed a material breach of the License Agreement and thus has terminated its rights under the contract. Thus, Hyundai remains "licensed" under the contract until December 31, 2000—the date the License Agreement *must* terminate.

fore, merely designates the state whose law is to be applied to the extent its use is not preempted by nor contrary to the policies of the 1909 and 1976 Copyright Acts"); *see also Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). With this limitation in mind, this Court now visits New York contract law.

### 6. The License Agreement is Unambiguous

A Texas-size review of New York contract law reveals a considerable amount of similarity between the sister states.[34] The Western District of New York aptly captured New York contract law relating to interpretation:

> When considering the construction of a contract, the court "should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" Only where the language at issue is unambiguous may the court construe it as a matter of law. Whether an ambiguity exists in a contract is a question of law to be resolved by the court. The Second Circuit has made it clear, however, that if the contract is found to be ambiguous, a motion for summary judgment—much less a motion to dismiss—on a breach of contract claim is improper.

*OnBank & Trust Co. v. FDIC*, 967 F.Supp. 81, 90 (W.D.N.Y.1997) (citations omitted).

 Under New York law, the initial question before this Court is whether the disputed language of the License Agreement—specifically Article 5.2(A)(ii)—is unambiguous. *Chimart Associates v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 489 N.E.2d 231, 234 (N.Y.1986). Contract language is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which

there is no reasonable basis for a difference of opinion." *Tucker Leasing Capital Corp.*, 833 F.Supp. 948, 955 (E.D.N.Y.1993) (citations omitted).

> An ambiguous term, on the other hand, is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Curry Rd. Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2nd Cir.1990) (quoting *Eskimo Pie v. Whitelawn Dairies*, 284 F.Supp. 987, 994 (S.D.N.Y.1968)). Both Texas Instruments and Hyundai offer different interpretations of Article 5.2(A)(ii) of the License Agreement. However, unambiguous contractual language does not become ambiguous simply because the parties to the litigation offer different interpretations. *Metropolitan Life Ins. Co. v. RJR Nabisco*, 906 F.2d 884, 889 (2nd Cir.1990). Moreover, both Texas Instruments and Hyundai agree that the License Agreement is unambiguous. In the deposition of Texas Instruments' corporate representative, Mr. Richard Donaldson, the following exchange took place: "Q: [by Mr. T. John Ward]: Well, I'm wanting to know what TI's position is without regard to what Hyundai's position is. Is the agreement ambiguous or unambiguous? A: [by Mr. Richard Donaldson]: That the agreement as a whole is not ambiguous." *Hyundai's Motion for Summary Judgment*, Exhibit C (Donaldson Depo.) at 44:1–9. In its brief "Hyundai agrees with TI that the License Agreement is unambiguous." *Id.* at 20. Furthermore, this License Agreement is a fully integrated contract. The final provision of the License Agreement, Article 9.15, contains a typical integration clause:

> *This Agreement sets forth the entire agreement and understanding between*

---

34. Nonetheless, let no appellate brief take this statement to mean this Court has steered away from New York contract law in its anal-

ysis. This Court will apply *New York* law in its analysis of the License Agreement. End disclaimer.

*the parties as to the subject matter of this Agreement and merges all prior discussions between them.* Neither of the parties shall be bound by any modification of this Agreement, other than as expressly provided in this Agreement or as duly set forth on or subsequent to the date hereof in writing and signed by a duly authorized representative of both parties.

*License Agreement* at 54 (emphasis added). Finally, this Court agrees with the parties that the language of the License Agreement is unambiguous. The License Agreement is a fully integrated contract that has definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion. In short, the License Agreement is fully integrated and unambiguous.

### 7. Interpretation of the Unambiguous License Agreement—Extrinsic Evidence Not Permissible Under New York Law

Once an integrated contract is found to be unambiguous on its face, its interpretation is a function for the Court and is properly decided on summary judgment. *Chimart, supra* at 572, 498 N.Y.S.2d 344, 489 N.E.2d 231 Both Texas Instruments and Hyundai contend that the disputed sales cap provision unambiguously supports their interpretation. So, this Court must now interpret the "unambiguous" Article 5.2(A)(ii) sales-cap provision of the License Agreement. Texas Instruments has proffered a considerable amount of extrinsic evidence in support of its interpretation of the License Agreement. Hyundai has objected to this extrinsic evidence and argues that this Court may not consider it in its analysis. The question, then, becomes this: Applying New York law, may this Court consider extrinsic evidence in its interpretation of the unambiguous License Agreement? No, it may not.

New York law does not permit a court to consider extrinsic evidence in the interpretation of an unambiguous contract. The Court of Appeals of New York has consistently held that "[i]nterpretation of an unambiguous contract provision is a function for the court, and *matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.*" *Chimart, supra* at 572–73, 498 N.Y.S.2d 344, 489 N.E.2d 231 (emphasis added) (quoting *Teitelbaum Holdings v. Gold*, 48 N.Y.2d 51, 56, 396 N.E.2d 1029, 1034, 421 N.Y.S.2d 556, 561 (1979); *Rainbow v. Swisher*, 72 N.Y.2d 106, 109, 527 N.E.2d 258, 259–60, 531 N.Y.S.2d 775, 776–77 (1988)) ("Where, as here, the contract is clear and unambiguous on its face, the intent of the parties must be gleaned *from within the four corners of the instrument, and not from extrinsic evidence*" (emphasis added)); *Express Ind., and Terminal Corp. v. New York State Dept. of Transp.*, 252 A.D.2d 376, 676 N.Y.S.2d 62 (N.Y.App. Div.1998) ("It is settled that where a contract is straightforward and unambiguous, its interpretation presents a question of law for the court, *to be made without resort to extrinsic evidence*" (emphasis added)); *see also Metropolitan Life Ins. v. RJR Nabisco, supra* ("The parties' rights under an unambiguous contract should be fathomed *from the terms expressed in the instrument itself rather than from extrinsic evidence* as to terms that were not expressed or judicial views as to what terms might be preferable" (emphasis added)).

Texas Instruments argues that certain cases support its position that New York contract law permits the consideration of extrinsic evidence in this Court's interpretation of the unambiguous License Agreement. However, upon closer analysis, the cases cited by Texas Instruments reveal interpretations of *ambiguous* contractual language—not *unambiguous* contractual language. *See Alexander & Alexander Services v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2nd Cir. 1998) ("Exclusion E is fraught with ambiguities .... The district court erred in

granting summary judgment to Lloyd's on the ground that Exclusion E unambiguously excluded all relevant coverage"); *On-Bank, supra* at 90 ("In the case at bar, I find that the Agreement is ambiguous ..."); *see also, Garza v. Marine Transp., Lines, Inc.,* 861 F.2d 23, 27 (2nd Cir.1988) ("We believe that the red-letter clauses are ambiguous as a matter of law ..."); *see also, Asheville Mica Co. v. Commodity Credit Corp.,* 335 F.2d 768, 770 (2nd Cir. 1964) ("The provision in question is not wholly unambiguous ..."); *Marvel Entertainment Group, Inc. v. Young Astronaut Council,* 747 F.Supp. 945, 948 (S.D.N.Y. 1990) ("If ambiguities in the document prevent a firm conclusion that it is a release, additional evidence may be considered to resolve this issue."); *Wing Ming Properties (U.S.A.) Ltd. v. Mott Operating Corp.,* 148 Misc.2d 680, 561 N.Y.S.2d 337, 340 (Sup.1990), *aff'd,* 79 N.Y.2d 1021, 594 N.E.2d 921, 584 N.Y.S.2d 427 (1992) ("If ambiguities exist in either the language employed or the intent and circumstances surrounding its execution, extrinsic evidence may be offered ..."); *In re Rudolph's Will,* 123 N.Y.S.2d 731, 733 (Sur. 1953) (examining extrinsic evidence where the language of a decedent's will failed to define the term "children"). Indeed, the cases cited by Texas Instruments support the exclusion of extrinsic evidence in this Court's interpretation of the unambiguous License Agreement. *Natwest USA Credit Corp. v. Alco Standard Corp.,* 858 F.Supp. 401, 413 (S.D.N.Y.1994) ("When a written contract is clear and unequivocal, *its meaning must be determined by its contents alone, without resort to extrinsic evidence ...*" (emphasis added)); *Alexander & Alexander, supra* at 86 ("If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract *without the aid of extrinsic evidence*" (emphasis added)); *Garza, supra* at 26–27

("In the absence of ambiguity, *the effect of admitting extrinsic evidence would be to allow one party 'to substitute his view of his obligations for those clearly stated'*" (emphasis added)) (quoting *Eskimo Pie Corp., supra* at 994; *Wing Ming Properties Ltd., supra* at 340 ("Interpretation of contracts is generally considered a matter of law to be determined by the court provided that the document is clear and explicit in its terms and can be construed *through an analysis of the four corners of the document*" (emphasis added)).

Moreover, specific provisions of the License Agreement militate against the admission of extrinsic evidence for interpretive purposes. First, the License Agreement is a fully integrated contract. *See Integration Clause, supra* at 21. Furthermore, another provision of the License Agreement weighs against the admission of extrinsic evidence for interpretive purposes. Article 9.9 of the License Agreement states:

> *No oral explanations or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.* No modification, alteration, addition or change in the terms thereof shall be binding on either party unless reduced to writing and executed by a duly authorized representative of each party.

*License Agreement* at 54 (emphasis added). Thus, both New York law and specific provisions of the License Agreement militate against any admission of extrinsic evidence for interpretation of the unambiguous License Agreement.. Hyundai's objection to Texas Instruments' proffer of extrinsic evidence for the interpretation of the License Agreement (the objection that strikes at the key issue before this Court) is hereby SUSTAINED. This Court will not consider any extrinsic evidence for its interpretation of the License Agreement.[35]

---

**35.** Some extrinsic evidence appears in this Court's recitation of the extensive history between Texas Instruments and Hyundai. However, this is only to provide the reader with the appropriate history between the parties—not for interpretive purposes. Again, this Court expressly refuses to consider any of this extrinsic evidence during its interpreta-

## 8. Interpreting the License Agreement

 How does this Court "interpret" a contract under New York law? "In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into the agreements." *Metropolitan Life Ins. Co., supra* at 889 (citing *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72, 305 N.E.2d 907, 910, 350 N.Y.S.2d 895, 898 (N.Y.1973); *Morlee Sales Corp. v. Manufacturers Trust Co.*, 9 N.Y.2d 16, 19, 172 N.E.2d 280, 282, 210 N.Y.S.2d 516, 518 (N.Y.1961); and S. Williston, 4 *Williston on Contracts* § 600 at 280 (3d ed.1961)). Since this Court can not consider any extrinsic evidence in its interpretation of the unambiguous License Agreement, it must interpret the contract in accordance with the intentions of the parties gleaned from the unequivocal language contained within the four corners of that fifty-five-page agreement. *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548, 658 N.E.2d 715, 720, 634 N.Y.S.2d 669, 674 (1995) (clear and complete writings should be enforced according to their terms). The law favors an interpretation which is supported by the agreement as a whole and does not render any of its provisions illusory or meaningless. *Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 584, 671 N.E.2d 534, 536, 648 N.Y.S.2d 422, 424 (1996) ("We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect") Although this Court must disregard extrinsic evidence during its interpretation of the License Agreement, it may not simply turn a blind eye to the logical implications of the interpretation it makes. "A contract must be construed, if possible, to avoid an interpretation that will result in an absurdity, an injustice or have an inequitable or unusual result." *Natwest USA Credit Corp.*, 858 F.Supp. 401, 413 (S.D.N.Y.1994); *see also Smith v. Brown & Jones*, 167 Misc.2d 12, 633 N.Y.S.2d 436, 442 (N.Y.Sup.Ct.1995)

(citations omitted) ("A contract should be given a fair and reasonable interpretation based upon its language, in light of the purposes sought to be attained by the parties. An unreasonable interpretation or an absurd result should be avoided").

 Thus, under New York contract law, this Court's objectives are roughly threefold: 1) give effect to the intentions of Texas Instruments and Hyundai (gleaned from within the four corners of the License Agreement); 2) interpret the language of the License Agreement so as to harmonize the contract's provisions without rendering any of them illusory or without effect; and 3) avoid an interpretation that leads to an absurdity, injustice, or inequity.

## 9. Article 5.2(A)(ii)—The Sales Cap Provision

Once again, Article 5.2(A)(ii) is the sales cap provision. It's what this fight is all about. Although it has already been quoted in its entirety, the sales cap portion of Article 5.2 deserves revisiting yet again:

> Article 5.2(A)(ii) In consideration for the licenses granted hereunder by TI to HEI during the period ("Second Period") commencing on January 1, 1996, and ending upon the first to occur of:
>
> (i) December 31, 2000, or
>
> (ii) *HEI's cumulative worldwide sales of ROYALTY BEARING PRODUCTS during the Second Period reaching an amount equal to the product of one and one-tenths (1.1) multiplied by three billion five hundred forty one million United States dollars (U.S.$3,541,000,000) ...* [36]

*License Agreement* at 30 (considerable emphasis added). Section (A)(ii) of Article 5.2 is the unambiguous sales cap provision of the License Agreement that this Court must interpret for the parties. Texas Instruments says cumulative worldwide sales have reached the sales cap and the con-

---

tion of the unambiguous sales-cap provision of the License Agreement.

**36.** Article 5.2 is quoted, in its entirety, *supra* pp. 670–671.

tract has terminated. Hyundai says the opposite—that cumulative worldwide sales have *not* reached the sales cap and that it was still licensed when Texas Instruments filed its patent infringement lawsuits (thereby violating the agreement and terminating its rights).

■ Obviously, in order to determine whether the sales cap has been reached, this Court must define "royalty bearing products." Once the Court determines what "royalty bearing products" are, only simple arithmetic remains to see if the sales cap has indeed been triggered. Article 1.21 of the License Agreement defines "royalty bearing products." It reads, in its entirety:

> 1.21 "ROYALTY BEARING PRODUCTS" means items (c) and (d) set forth in Article 1.20, however, ROYALTY BEARING PRODUCTS shall not mean SEMICONDUCTIVE ELEMENTS, or SEMICONDUCTIVE APPARATUS, which are discrete devices such as transistors, photo transistors, diodes and SCRs.

*License Agreement* at 12. The language of this provision refers to yet another provision.[37] That is, in order to define "royalty bearing products" this Court must now look to "items (c) and (d) set forth in Article 1.20." *Id.* Article 1.20 reads, in its entirety:

> 1.20 "LICENSED PRODUCTS" means any of the following items (a)—(h) and parts thereof covered by any claims(s) of HEI PATENTS, HEI—PARTICIPATION PATENTS, TI PATENTS, or TI–PARTICIPATION PATENTS:
>
> (a) SEMICONDUCTIVE MATERIAL
>
> (b) JUNCTION MATERIAL
>
> *(c) SEMICONDUCTIVE ELEMENTS*

> *(d) SEMICONDUCTIVE APPARATUS*
>
> (e) TEST EQUIPMENT AND SYSTEMS
>
> (f) PERSONAL COMPUTERS
>
> (g) PERIPHERAL DEVICES
>
> (h) GRAPHICS DISPLAY SYSTEMS
>
> LICENSED PRODUCTS does not include: (i) DEFORMABLE DEVICES; (ii) DMD SYSTEMS; (iii) HETERO–JUNCTION BIPOLAR TRANSISTORS; or (iv) MONOLITHIC UNCOOLED DETECTORS.

*License Agreement* at 11 (emphasis added).[38] So here are the arguments. Texas Instruments says that Article 1.21 defines "royalty bearing products" by incorporating *only* "semiconductive elements" and "semiconductive apparatus"—that is, incorporating only *"items* (c) and (d) set forth in Article 1.20" and not all of Article 1.20. Hyundai disagrees. It argues that Article 1.21 defines "royalty bearing products" by incorporating *all* of Article 1.20—that is, incorporating "items (c) and (d) *set forth in Article 1.20.*" Why does it matter? Because if Hyundai's interpretation is correct (if all of Article 1.20 is incorporated into the definition of "royalty bearing products"), then Article 1.20's prefatory language is also incorporated into the definition of "royalty bearing products." As a result, the "covered by" language makes it into the definition of "royalty bearing products." thereby requiring each royalty bearing product to be "covered by" a claim of a Texas Instruments patent or Texas Instruments Participation Patent. It is upon this cross-referencing and incorporation that Hyundai bases its "TI Country Concept" interpretation of the License Agreement; that is, the only products which count toward the sales cap calculation are products which are "covered by" a

---

37. All of this unnecessary cross-referencing and partial provision-incorporation is what leaves this fifty-five page License Agreement susceptible to multiple interpretations (the legal profession has always been hesitant to simply say what it means without self-affirming legalese and complication). Only one of these interpretations, however, is reasonable.

38. This Court is fully aware that it has twice quoted Article 1.21 of the License Agreement This section is absolutely critical to interpretation of the parties' License Agreement.

Texas Instruments patent—products that practice a Texas instruments patent, in force at the time the product is sold, in the country in which the sale occurs.[39] All other countries, according to Hyundai, are "Non–TI Countries" which do not count toward the sales cap calculation since those particular products are not "covered by" valid patents in those individual countries.[40]

Before delving into the particulars and losing the forest for the trees, this Court must first make a general observation about the License Agreement itself. Although the "sales cap" provision is the focus of this Court's attention, there are in fact *two* "cap" provisions: a "sales cap" provision and a "royalty cap" provision.[41] As previously mentioned, the sales cap provision lies in Article 5.2(A)(ii) and is the focus of this Court's attention. Once it is triggered, the contract terminates and Hyundai is *no longer* licensed to use Texas Instruments' products without infringement. Under the License Agreement, Hyundai agreed to pay Texas Instruments "royalties" for the use of Texas Instruments' products. The calculation of royalties owed by Hyundai expressly depends on the amount of "royalty bearing products." However, the amount of royalties per year is "capped"—that is, although Hyundai must periodically pay a certain amount of royalties, that amount shall not exceed a specific amount set for each year.

Part of the confusion lies in the interplay of these facets of the contract, particularly since the "sales cap" itself lies within the "Royalties" article (sales-cap provision 5.2(A)(ii) lies within "Royalties" Article 5). The dynamics of the sales cap and royalty provisions will prove crucial to a proper interpretation of the License Agreement.

10. **Harmonizing Article 5.2(A)(ii) With the Whole License Agreement**

A. Articles 1.10, 1.11, 1.20 and 1.21—Definitions, Cross–References, and Incorporation

At the outset, this Court notes that Article 1.21, the article defining "royalty bearing products," references "items (c) and (d) set forth in Article 1.20." *License Agreement* at 12 Rather than simply say "semiconductive elements" and "semiconductive apparatus," the parties chose to say "items (c) and (d) set forth in Article 1.20." Article 1.20 is the "Licensed Products" article. The parties chose to reference "semiconductive elements" and "semiconductive apparatus" set forth in Article 1.20 (the "Licensed Products" provision) even though "semiconductive elements" and "semiconductive apparatus" are themselves defined in Articles 1.10 and 1.11, the provisions that define "semiconductive elements" and "semiconductive apparatus." *License Agreement* at 6–8.

---

**39.** For example, say that Texas Instruments has two different DRAM products that Hyundai wants to sell in two different countries. Hyundai concedes that the sales of products in the United States count toward the sales cap calculation. However, Hyundai argues that sales of products in Korea are not "royalty bearing products" and do not count toward the sales cap calculation. Hyundai's sale of one of Texas Instruments' DRAM products in the United States would count toward the sales cap calculation; while Hyundai's sale of one of Texas Instruments' DRAM products in Korea (incidentally, Hyundai's home) would *not* count toward the sales cap calculation. Although this example may seem over-simplistic, later this Court will show how these two simple facts can turn into a legal nightmare under one of the proffered interpretations of the License Agreement.

**40.** Apparently, these countries are supposed to be freebies as far as the sales cap calculation is concerned.

**41.** Technically, it's royalty "caps" since the License Agreement lays out specific caps for each year through the year 2000 (when the contract *must* terminate regardless of sales). These annual royalty caps are as follows:

| Year | Annual Maximum |
|------|----------------|
| 1993 | U.S. $ 9,628,000 |
| 1994 | U.S. $ 8,964,000 |
| 1996 | U.S. $15,000,000 |
| 1997 | U.S. $15,000,000 |
| 1998 | U.S. $17,000,000 |
| 1999 | U.S. $18,000,000 |
| 2000 | U.S. $18,000,000 |

*License Agreement* at 29—30.

Thus, in Article 1.21 the parties initially chose "items (c) and (d) set forth in Article 1.20" instead of simply saying "semiconductive elements" and "semiconductive apparatus" which are specifically defined in Articles 1.10 and 1.11 of the License Agreement. At first glance, this suggests a meaning for "semiconductive elements" and "semiconductive apparatus" altogether different than those definitions specifically provided in the License Agreement.[42] However, in the same Article—Article 1.21—the parties later chose to simply say "semiconductive elements" and "semiconductive apparatus," thereby explicitly relying upon Articles 1.10 and 1.11 which specifically define those terms. If this Court were to adopt Hyundai's interpretation of that provision, the definition of "royalty bearing products" would abound in complicity and inequity.

Here is what would happen to Article 1.21 (the article defining "royalty bearing products") were this Court to adopt Hyundai's interpretation. Article 1.21 would initially *include only* licensed semiconductive elements and semiconductive apparatus as "royalty bearing products" applicable to the sales cap calculation. However, in the same breath, Article 1.21 would *exclude both licensed and non-licensed* semiconductive elements and semiconductive apparatus "which are discrete devices such as transistors, photo transistors, diodes and SCRs" (regardless of whether they are "licensed" or not) from the sales cap calculation. *License Agreement* at 12. "Semiconductive elements" and "semiconductive" apparatus would take on different meanings in the same calculation, thereby warping the math in favor of Hyundai. The net result would be that Hyundai would be required to include *only* "li-

*censed"* semiconductive elements and semiconductive apparatus toward the sales cap calculation, while it could simultaneously exclude *all* semiconductive elements and semiconductive apparatus which are discrete devices from the same calculation.[43] All of this results, of course, from the differing definitions of "semiconductive elements" and "semiconductive apparatus" within Article 1.21 defining royalty bearing products.[44] .

So what if Article 1.21 replaced "semiconductive elements" and "semiconductive apparatus" with its previously employed "items (c) and (d) set forth in Article 1.20?" That is, what if Article 1.21 used consistent terminology throughout its royalty-bearing-product definition? This would harmonize the article, and provide consistency to Article 1.21, but it would not solve the problem of Article 1.20's incorporation. If this Court were to adopt Hyundai's interpretation, it would have to rewrite Article 1.21 so that it read: "'ROYALTY BEARING PRODUCTS' means *LICENSED PRODUCTS provided for in* items (c) and (d) set forth in Article 1.20..." (emphasis added to show additional language required for Hyundai's interpretation). In fact, the parties used this precise language when they intended for "items (c) and (d) set forth in Article 1.20" to be "LICENSED PRODUCTS" In two articles—Articles 1.3 and 3.9—the parties actually said "LICENSED PRODUCTS provided for in items (c) and (d) only, of Article 1.20." *See Articles 1.3, 3.9, License Agreement* at 4, 25. By simply referencing "items (c) and (d)" the parties did not intend to incorporate by reference all of Article 1.21 into the definition of royalty bearing products. Had the parties intended royalty bearing products to mean *licensed* semiconductive elements and

---

42. To be specific, it supports Hyundai's "TI Country Concept" interpretation of the License Agreement.

43. Complicity, inequity, and absurdity abound in Hyundai's "TI Country Concept" interpretation of the License Agreement. This is only one of many examples.

44. In order to avoid this complicity, Article 1.21 would have to replace its "semiconductive elements" and "semiconductive apparatus" with its previously employed "items (c) and (d) set forth in Article 1.20." This would harmonize the article; however, it would, nonetheless, fail to support Hyundai's interpretation.

semiconductive apparatus other than discrete devices, they would·have simply said so like they did in Articles 1.3 and 3.9 of the License Agreement. Hyundai's interpretation renders the "LICENSED PRODUCTS" language in these provisions meaningless. Simply put, Hyundai's "TI Country Concept" interpretation does overall violence to the License Agreement.

## B. Article 5 in its Entirety—Royalties for Nothing, Chips for Free

Once again, Article 5, entitled "Royalties," contains within it both of the "caps"—the sales cap and the royalties cap.[45] Hyundai cautions this Court not to confuse the sales cap provision with the royalty cap provision. Mindful of this warning, the Court nonetheless notes that a single definition of "royalty bearing products" applies to numerous provisions dealing with both the sales cap (Article 5.2(A)(ii)) and royalty calculations. That is, the License Agreement sprinkles the same term—royalty bearing products—throughout provisions of Article 5 that deal with calculation of both the sales cap and the payment of royalties. *See License Agreement, Articles 5.1(b) and (c), 5.2(A)(ii), 5.3, and 5.6.* Thus, the interpretation of "royalty bearing products"

necessarily implicates both the sales cap provision and provisions relating to the calculation of royalties.

If royalty bearing products are indeed only "licensed" products (products that practice a Texas Instruments patent, in force at the time the product is sold, in the country in which the sale occurs), then under the License Agreement Hyundai has committed itself to paying millions of dollars for Texas Instruments products that are in fact not "licensed." Here is why. Articles 5.1(b), 5.1(c), and 5.2 provide mechanisms for calculating the royalties that Hyundai owes Texas Instruments for the sale of its products under the License Agreement Each provision contains identical language for making the royalty calculation: "eight percent (8%) of the NET SALES BILLED of all ROYALTY BEARING PRODUCTS used, leased, sold or otherwise disposed of by HEI or its SUBSIDIARIES..." *See Articles 5.1(b), 5.1(c), and 5.2, License Agreement* at 29–30.[46] In order for Texas Instruments to establish just one of its products as a royalty bearing product under Hyundai's interpretation of that term, Texas Instruments would have to study the patent laws of the country in which the sale is made by Hyundai,[47] file a patent-infringement law-

**45.** Once again, technically, it's royalty "caps" since the License Agreement lays out specific caps for each year through the year 2000 (when the contract *must* terminate regardless of sales). *See supra* note 41.

**46.** Specifically, Sections 5.1(b) and 5.1(c) provide mechanisms for calculating royalties that Hyundai owes Texas Instruments for years 1993 and 1994, respectively—years during the "first period" of the License Agreement that has now terminated. Each section provides a specified amount that Hyundai's amount owed to Texas Instruments may not exceed. Section 5.2 provides an identical method for calculating these royalties for the years 1996 through 2000 (the year the License Agreement *must* terminate regardless of sales). Like Sections 5.1(b) and 5.1(c), Section 5.2 includes a series of royalty caps per year between the years 1996 and 2000 (this provision has already been quoted). *See supra* note 41. Thus, pursuant to Article 5.2's royalty cap provision, if Hyundai experiences tremendous growth between 1996 and 2000

boosting its sales of royalty bearing products, its royalties will not shoot through the roof since they are capped at specified limits. Texas Instruments enjoys similar protection. Pursuant to Article 5.2(A)(ii) (the sales cap), if Hyundai experiences tremendous growth between 1996 and 2000 expanding its market of Texas Instruments' products, the contract will automatically terminate and Texas Instruments will not be tied to a runaway contract wherein Hyundai's sales (via its growth) overshadow its royalties.

**47.** Hyundai contends that worldwide litigation would not ensue since Article 9.11 of the License Agreement confines the parties to a New York federal court. Article 9.11 reads, in its entirety:

Neither party nor its SUBSIDIARIES sublicensed hereunder shall commence any litigation against the other arising out of this Agreement or the termination thereof as to any matter not subject to arbitration pursuant to Article 7.4 or with respect to any

suit against Hyundai on that single product, and win a verdict of infringement against Hyundai under the patent laws of that particular country for that particular product.[48] Notwithstanding the extraordinary time and expense involved in such an endeavor, what does all of that achieve? Well, Texas Instruments inches toward the sales cap and gets a few extra bucks in royalties since it has now "established" this single product as a "licensed" product "covered by" the claim of a Texas Instruments Patent or Texas Instruments Participation Patent. The only way the parties could establish "royalty bearing products" to determine royalties would be through product-by-product, patent-by-patent, country-by-country litigation. In order to reach the sales cap provision and reap the rewards of its royalties, Texas Instruments would literally have to file (and win) a patent-infringement lawsuit for each product for each country where Hyundai is selling that particular Texas Instruments product. This global litigation war would turn into a litigation holocaust—with the bulk of the fighting going on in a New York federal court.[49]

An even more bizarre result occurs from Hyundai's "TI Country Concept." Under Hyundai's "TI Country Concept" interpretation of the License Agreement, Texas Instruments would have to prove up each "licensed product" as a product that practices a Texas Instruments patent, in force at the time the product is sold, in the country in which the sale occurs—a product "covered by" a *valid* Texas Instruments patent or Texas Instruments Participation Patent. So what is Hyundai licensed to sell under the License Agreement? By Hyundai's interpretation, nothing until Texas Instruments takes a patent infringement verdict against Hyundai on that particular product under the patent laws of the country in which Hyundai's sale occurs. The *License* Agreement, then, actually *licenses nothing.* Hyundai is not "licensed" under the License Agreement until Texas Instruments brings, and wins, a patent infringement lawsuit against Hyundai on a Texas Instruments

arbitration provisions or award, except in a Federal Court located in the State of New York. Each party consents to jurisdiction over it by such court.
*License Agreement* at 52. Hyundai says Texas Instruments is "incorrect" that worldwide litigation would ensue under the "TI Country Concept" interpretation of the License Agreement since the parties agreed to hear their contract-related disputes in a New York federal court. *Hyundai's Sur-reply in Support of Hyundai's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Hyundai's Sur–Reply")* at 9–10. In fact, New York District Judge Patterson found that Hyundai waived this forum selection clause of Article 9.11. Thus, worldwide litigation *has* ensued. Nevertheless, this is extrinsic evidence; and this Court expressly refuses to consider it in its analysis. Hyundai notes that a United States court is competent to decide questions relating to foreign patents. *Ortman v. Stanray Corp.*, 371 F.2d 154 (7th Cir.1967). So, argues Hyundai, this "worldwide" litigation really would not ensue since the patents would be tried in a New York federal court. Even giving Hyundai the benefit of the doubt by assuming the forum selection clause has *not* been waived (even though it has), Hyundai is really making their interpretation even more unworkable with this argument. There would still have to be a "country-by-country" patent analysis of each product—it would just have to be done by a New York district court. Hyundai's attempt to rebuke Texas Instruments' "worldwide litigation" scenario really does it more harm than good. Now, Hyundai says rather than spreading this patent-by-patent analysis amongst courts around the world in the products' respective countries (*foreign* courts probably more competent to make the *foreign* patent determination), *all* products would be tried in a (very busy) New York federal court pursuant to Article 9.11. That is, the product by product, patent by patent, country by country analysis would be conducted entirely by a New York federal court. Nevertheless, giving Hyundai the benefit of the doubt, when this Court uses "country-by-country" to describe the "TI Country Concept," it will refer to a country-by-country patent analysis conducted by a New York federal court.

48. A process Texas Instruments appears to be pursuing.

49. Once again, giving Hyundai the benefit of the doubt, this Court assumes the forum selection clause of Article 9.11 has *not* yet been waived (even though it has).

product for the country in which the particular product was sold—thereby proving it is "covered by" a *valid* Texas Instruments patent and, consequently, a "licensed product." By simply executing the License Agreement Hyundai agreed to pay 58,400,000.[50] *Article 5.1, License Agreement* at 29. So, what Hyundai urges this Court to hold is that the License Agreement provides mechanisms whereby it pays millions of dollars for products that it is probably (absent litigation) not even licensed to use. That is, this fifty-five page License Agreement actually licenses nothing until the parties battle each other in court.[51] It gets worse.

In footnote thirty-nine, this Court began with a simple example of Hyundai's "TI Country Concept" interpretation of the License Agreement. Now, this Court will take that simple example and show how the "TI Country Concept" interpretation of the License Agreement devolves into a legal nightmare. Okay, say that Hyundai makes a DRAM ("dynamic random access memory") product in Korea—under Hyundai's interpretation, a "Non–TI Country." That DRAM made in Korea (incidentally, Hyundai's home) is not "covered by" a valid, Korean-issued Texas Instruments patent and thus is *not licensed* under the License Agreement.[52] Hyundai then sells that DRAM to a Taiwanese personal computer ("PC") manufacturer, "Tai–PC,

Mfg.,"[53] which incorporates it into a PC in Taiwan, another "Non–TI Country" under Hyundai's interpretation. Thus, the DRAM remains unlicensed. If Tai–PC, Mfg. then sells its PC containing the unlicensed DRAM to Compaq[54] in the United States, it is *still* unlicensed. However, Tai–PC, Mfg. and Compaq are subject to actions in the United States for direct infringement; and Hyundai itself, if it knew or had reason to know the DRAM was ultimately bound for the United States, would be subject to suit for inducing infringement. The License Agreement would not protect Hyundai because it only protects Hyundai for making, using, selling, or importing products into the United States. In this particular example, Hyundai did not make the DRAM in the United States, did not use it in the United States (Compaq did), did not sell it in the United States (Tai–PC, Mfg. and Compaq did), and did not import it into the United States (Tai–PC, Mfg. and Compaq did). The License Agreement simply does Hyundai no good. Similarly, *Hyundai's* United States License cannot be used vicariously by either Tai–PC, Mfg. or Compaq since, by definition, they are not Hyundai and the license only covers Hyundai. Under Hyundai's theory, the DRAM was *never licensed* to Hyundai.[55] The net result of all this is a random mix of licensed and unlicensed Hyundai products,

---

**50.** In fact, Hyundai has simply tendered the maximum amount of royalties to Texas Instruments pursuant to Sections 5.1(b), 5.1(c), and 5.2(A). However, this is extrinsic evidence and, pursuant to New York contract law, this Court will not consider it in its interpretation of the License Agreement.

**51.** Hyundai argues that Article 6.1—the audit provision—provides a mechanism for determining what "royalty bearing products" are and, consequently, whether the sales cap has been reached and what amount of royalties Hyundai owes Texas Instruments. This Court addresses this argument in the following section discussing Article 6.1. *See infra* pp. 684–688.

**52.** Hyundai cannot escape the simple fact that the "covered by" language does *not* appear in

the definition of "royalty bearing products," but rather, in the definition of *licensed products* ("covered by" makes it into royalty bearing products only through Hyundai's zig-zagging, cross-referencing, and incorporation). The unavoidable result of this fact is that any product which is not "covered by" a *valid* Texas Instruments patent under Hyundai's theory is *unlicensed* as well.

**53.** A fictitious company.

**54.** A not-so fictitious company.

**55.** However, if Hyundai made the DRAM in Korea and sold it either directly to Compaq or through Hyundai's subsidiary, the License Agreement would indeed be effective to shield Hyundai, its subsidiary, and Compaq from lawsuit.

whereby the unlicensed products, if brought in indirectly from "Non–TI Countries," would subject Hyundai to claims of inducing infringement.

Before this Court departs Article 5, it must visit a few of its other provisions. Hyundai directs this Court to Article 5.3 which holds, in part, "Royalties shall not be due from HEI for, and HEI's cumulative worldwide sales of ROYALTY BEARING PRODUCTS specified in (ii) of Article 5.2(A) shall not include, any ROYALTY BEARING PRODUCTS (i) the manufacture, use, lease, importation, sale or other disposal of which is not licensed hereunder. . ." *License Agreement* at 31. Hyundai says this provision "clearly requires sales counted toward the sales cap to be sales of LICENSED PRODUCTS." *Hyundai's Opposition Brief* at 16 (Hyundai's emphasis). First, note the sleight of hand—"LICENSED PRODUCTS" appears nowhere in that provision. Apparently, Hyundai is seizing upon the "licensed hereunder" language and re-writing it to "clearly" read "LICENSED PRODUCTS" (which is specifically defined in Article 1.20).[56] Once again, "LICENSED PRODUCTS" is itself defined in article 1.20. Had the parties wanted to draft this provision so as to support Hyundai's "TI Country Concept," they would have simply added "LICENSED PRODUCTS" to that provision so that it read: "ROYALTY BEARING PRODUCTS that are LICENSED PRODUCTS specified in (ii) of Article 5.2(A) . . . ." This they did not do. More-over, this Court notes that Article 5.3, like many other provisions of the License Agreement, refers to "HEI's *cumulative worldwide*[57] *sales* of ROYALTY BEARING PRODUCTS." *License Agreement* at 31. Had the parties intended for cumulative worldwide sales to be restricted to licensed products, they would have simply said: "cumulative worldwide sales of ROYALTY BEARING PRODUCTS that are *LICENSED PRODUCTS.*" Once again, this they did not do.[58]

One final provision of Article 5 deserves visiting. Article 5.4 reads, in its entirety:

The parties acknowledge that the royalty rates specified in Article 5, the method for calculation of royalties, and the method of payment of royalties under this Agreement, take into consideration (1) the value of the licenses granted to HEI and TI under this Agreement, and (2) *the administrative convenience of the parties hereto.*

*License Agreement* at 32 (emphasis added).

Of particular interest to this Court is the "administrative convenience" language employed by the parties. Hyundai argues, and this Court concedes, "that Article 5.4 expressly and exclusively addresses 'the *royalty rates* set forth in Article 5, the method for *calculation of royalties,* and the *method for calculation of royalties.*'" *Hyundai's Opposition Brief* at 23 (emphasis added). Thus, Hyundai argues, Texas Instruments can not employ this language to support its interpretation of the sales

---

56. If that is not the language Hyundai is marshaling to support its "TI Country Concept," then the only other language to support Hyundai's interpretation would be "ROYALTY BEARING PRODUCTS specified in (ii) of Article 5.2(A)." *License Agreement* at 31. However, this is the very language in dispute. This Court assumes that Hyundai would not support an interpretation with the very language it seeks to interpret (an ill-fated effort dubbed "begging the question"). Therefore, it must be the "licensed hereunder" language upon which Hyundai relies.

57. This Court need not (but will) point out the obvious: that "worldwide" indicates an ex-pansive view of royalty bearing products that cuts against Hyundai's restrictive interpretation of that term.

58. It strains logic that the parties would make such a monumental change (requiring country-by-country "licensure") to the key term "royalty bearing products" by inferentially "incorporating" Article 1.20 when the License Agreement already defines "licensed products" and could be specifically referenced. Once again, the operative term "LICENSED PRODUCTS" is conspicuously absent from yet another provision marshaled by Hyundai to support its "TI Country Concept" interpretation of the License Agreement.

cap since this particular provision is devoted strictly to royalties. The first warning by Hyundai to this Court was not to confuse the sales cap and the royalty cap. This was good advice; and this Court has not confused the sales cap with the royalty cap. However, now Hyundai wards this Court off of language simply because it relates to royalties and not the sales cap calculation. This is not such good advice. The sales cap provision and royalty calculation provisions have a common bond— the term "royalty bearing products." Interpretation of the term "royalty bearing products" necessarily implicates Articles 5.1, 5.2 (including the sales cap and royalty calculation provisions), 5.3 (the provision Hyundai urges this Court to disregard), and 5.6 of the "Royalties" Article. Indeed, the term "royalty bearing products" appears throughout the License Agreement no less than twenty times. Due to its ubiquitous presence throughout the License Agreement, the term "royalty bearing products" necessarily implicates interpretation of the entire contract—sales cap and royalty calculations alike.

Since interpretation of royalty bearing products expressly implicates calculation of royalties in Article 5, the "TI Country Concept" interpretation of royalty bearing products that leads to administrative *inconvenience* would cut against the express intention of the parties contained within

Article 5.4. Product by product, patent by patent, country by country [59] determination of royalty bearing products, and consequently, calculation of royalties owed by Hyundai, can hardly be called administratively *convenient*.[60] In fact, Hyundai's "TI Country Concept" interpretation of the License Agreement is an administrative nightmare. Moreover, Hyundai's "TI Country Concept" leads to yet another bizarre result. Under both Article 5.1 and 5.2 royalty calculation provisions, Hyundai's royalties owed under the contract are "eight percent (8%) of the NET SALES BILLED of all ROYALTY BEARING PRODUCTS used, leased, sold or otherwise disposed of by HEI or its SUBSIDIARIES." *License Agreement* at 29–30.[61] However, under Hyundai's "TI Country Concept" interpretation of the License Agreement, there are no "royalty bearing products" until Texas Instruments wins a verdict of infringement against Hyundai on that product, on that particular patent, under the patent laws of the particular country in which that product was sold (abbracadabbra—now it is a royalty bearing product).[62] So, under Hyundai's theory, it owes Texas Instruments no royalties since, technically, there are no royalty bearing products until Texas Instruments *proves them up* by piece-meal litigation; and, under the very terms of the contract, it has automatically paid millions of dollars

**59.** Remember, giving Hyundai the benefit of the doubt, *"country-by-country"* analysis must still be performed even though it is conducted by a New York federal court.

**60.** Article 5.7 cuts against Hyundai's "extra - litigation-required" interpretation of royalty bearing products necessary for the calculation of both the sales cap and royalties. Article 5.7 reads. in its entirety:

The entire obligation of the parties for royalty payments under this Agreement is as explicitly set forth in this Agreement, and *no other obligations for any payment of royalties under this Agreement shall be inferred or implied.*

*License Agreement* at 33. Now, Hyundai urges this Court to *"infer"* (or *"imply"*) an *"obligation"* on Texas Instruments to bring, and win, a patent infringement lawsuit

against Hyundai on a Texas Instruments product under the patent laws of the particular country in which the particular product was sold—thereby proving it is "covered by" a *valid* Texas Instruments parent and, consequently, a "royalty bearing product" applicable to royalty calculations. Thus, Hyundai urges this Court to interpret the License Agreement to violate Article 5.7—one of its own provisions.

**61.** Once again, these provisions each have different "caps" that prevent Hyundai's royalties from exceeding a specified amount. These caps have already been specified in a previous footnote. *See supra* note 41.

**62.** Hyundai argues that "good-faith" negotiations and Article 7.1 prevents such piecemeal litigation. The Court addresses this argument

for nothing.[63] Moreover, Hyundai would never really know which of Texas Instruments' products it is "licensed" to use under the License Agreement since its "TI Country Concept" requires litigation to establish what is "covered by" the contract. Finally, since Texas Instruments has to prove up (by litigation) each product as a royalty bearing product before it counts against Hyundai under the sales cap provision, Hyundai can simply use those chips without fear of early contract termination until Texas Instruments sues Hyundai on that product, on that patent, under the patent laws of the particular country in which that product was sold.[64] Simply put, Hyundai has been paying millions of dollars in royalties for nothing,[65] and can really use Texas Instruments' chips[66] free from fear of early termination.

### C. Article 6.1 and 7.1—Hyundai Make–Shifts a Workable Structure for its Interpretation

In defense of its product-by-product, patent-by-patent, country-by-country interpretation, Hyundai relies upon Texas Instruments' failure to exercise its audit right prescribed in Article 6.1. Within Article 6 (entitled "Accounting for Royalties and Taxes") sits Article 6.1—the audit provision. It reads, in part:

> ... Upon the reasonable request of TI, HEI and its SUBSIDIARIES shall permit access to their books and records by an independent accounting firm selected by TI and approved by HEI, which approval shall not be unreasonably withheld, for the sole purposes of (i) verifying the calculation of royalties due and payable pursuant to this Agreement, (ii) determining HEI's cumulative, direct, net sales to the United States of PERSONAL COMPUTERS, PERIPHERAL DEVICES and GRAPHICS DISPLAY SYSTEMS ("PC Sales") for the period commencing on July 25, 1989 and ending on December 31, 1995 or when such PC Sales exceed an amount equal to two hundred sixty million U.S. dollars ($260,000,000), whichever occurs first, and *(iii) determining HEI's cumulative worldwide sales of ROYALTY BEARING PRODUCTS*[67] *after December 31,*

in the following section. *See infra* pp. 684–688

**63.** Hyundai consistently argues that it has "credited" Texas Instruments's sales in the United States, Europe, and Japan toward the sales cap calculation. However, under its "TI Country Concept" theory, this credit is really just a benevolent gesture on its part. The following section explores this point. *See infra* pp: 684–688.

**64.** In fact, Hyundai has generously "credited" toward the sales cap sales of products in countries where Texas Instruments has filed patent infringement lawsuits. In every lawsuit, Hyundai (despite crediting the sales) has denied infringement. Hyundai argues it is "licensed" to sell these products and thus is not liable for infringement. However, in order to be "licensed" to use these products Texas Instruments would have to sue Hyundai on that product, under that patent, under the patent laws of that particular country in which the sale occurs. In every lawsuit Texas Instruments has filed against Hyundai, Hyundai has denied liability—thereby preventing Texas Instruments from establishing this product as a "royalty bearing product" that is "covered by" a Texas Instruments patent. Strangely, in defending these patent infringement lawsuits and preventing a product from

becoming a "royalty bearing product" applicable to the sales cap calculation, Hyundai is actually preventing itself from being "licensed" under the License Agreement. This Court re-visits this (yet another) bizarre position taken by Hyundai in the next section of its analysis. *See infra* section 10, pp. 688–691.

**65.** The fact that Hyundai has simply tendered the royalty cap amounts each time is extrinsic evidence and this Court expressly refuses to consider it in its analysis. However, pursuant to Article 5.1(a) of the License Agreement, Hyundai owes $8,400,000 sixty days after the effective date of the License Agreement. So, under the very terms of the agreement, Hyundai must be paying millions in royalties for *something*.

**66.** Or other products or processes.

**67.** This Court notes, once again, the ubiquitous presence of this term in both the sales cap and royalty calculations of the License Agreement. Any suggestion that the term royalty bearing products should only be interpreted in connection with the sales cap calculation ignores the simple fact that the royalty provisions of the contract *expressly* rely upon that term. Simply put, this Court can't inter-

*1995.* For any one of the above three purposes, TI shall seek permission for an audit no more than once each calendar year and shall bear the costs of the independent accounting firm.

*License Agreement* at 34. Hyundai argues this provision "undermines TI's argument about the administrative difficulties of calculating the sales cap because it is undisputed that TI never exercised its audit rights under that article .... If TI had conducted such an audit, it would simply have directed its auditors as to which sales to count; the auditors themselves would not have had to perform this analysis." *Hyundai's Opposition Brief* at 25. As Hyundai appears to concede, the auditors themselves could *not* have provided an answer as to which sales count under the sales cap and royalty calculations.[68] Hyundai suggests that Texas Instruments could have just "directed its auditors as to which sales count." *Id.* Well, then it's back to square one. Texas Instruments would just lean over the auditors' shoulders and point them to the worldwide sales of their products *regardless of patent coverage in those particular countries*—just what they argue today. Realizing the dog-chasing-its-tail approach to calculations under provisions such as these under its "TI Country Concept" interpretation, Hyundai suggested at the summary judgment hearing a solution: "As the contract provides about good-faith negotiations, the parties contemplated further negotiations, we sat down and told them the countries that we believed applied and should be counted." *Transcript of Summary Judgment Hearing* at 43:11–14. Apparently, rather than have the sales cap automatically terminate the contract, Hyundai urges this Court to accept its interpretation that the parties agreed to "negotiate" whether the provision actually triggers. That is, this auto-

matically terminating sales cap provision simply lies dormant until the parties successfully negotiate whether to awaken it. Indeed, Article 7.1 (entitled "Term and Termination") does provide for further negotiations:

> ... At any time *after* termination of this agreement due to termination of the Second Period according to (ii) of Article 5.2(A), or at any time subsequent to December 31, 1999, whichever occurs first, either party may request negotiations to consider the possible further *renewal* or *extension* of this Agreement. In such event, both parties agree to enter into good faith negotiations to determine whether a mutually acceptable *extension* or further *renewal* can be agreed upon prior to expiration of this Agreement. No *extension* or *renewal* shall be effective until a definitive agreement is executed by both parties.

*License Agreement* at 39–40 (emphasis added). First, this provision says that any time "*after termination* of this agreement due to *termination* of the Second Period according to (ii) of Article 5.2(A) [the sales cap provision]." *Id.* That is, *after* the sales cap provision has been triggered and *after* the contract has terminated, good-faith negotiations *may* ensue to *perhaps* trigger the sales cap provision.[69] Second, this provision provides for a "renewal" or "extension" of the contract—not a "grace period" whereby the now terminated contract somehow rises from its death to haunt the parties so long as good-faith negotiations continue. Finally, the provision itself envisions the possibility of its own failure: "No extension or renewal shall be effective until a definitive agreement is executed by both parties." *Id.* Under Hyundai's "good-faith-negotiations-about-the-sales-

---

pret royalty bearing products without considering its effect on royalty calculations.

**68.** Only a court could provide this answer since Texas Instruments would have to prove up that products as a royalty bearing product "covered by" a *valid* Texas Instruments patent. This process would necessarily include

the claim construction and validity issues concomitant with patent infringement analysis.

**69.** Borrowing a timeless sound byte from a semi-finalist of a recent talent contest, the parties will "definitely maybe" reach an agreement as to the viability of the sales cap provision. Incidentally, the contestant lost.

cap theory," the contract itself could void one of its very own provisions. If Texas Instruments and Hyundai could not come to an agreement about the triggering of the sales cap provision and the termination of the contract, then that provision would simple become a nullity. Even if Texas Instruments were right and the sales cap provision had been triggered, Hyundai could void the provision by simply refusing (in good faith, of course) to agree with Texas Instruments' correct interpretation of that provision. The License Agreement would continue until December 31, 2000 despite its *de facto* termination pursuant to the triggering of the sales cap provision (now rendered null via a stalemate in the "good-faith" negotiations of Article 7.1).

█ At this point in the analysis this Court must pause, once again, to step back from all of this to avoid losing sight of the forest for the trees. What is Hyundai doing to Article 7.1 and why is it trying to do it? Throughout this License Agreement there is the apparent lack of one, critical thing for the success of Hyundai's "TI Country Concept"—any workable formula to apply this patent-by-patent, product-by-product, country-by-country interpretation of the License Agreement.[70] At the summary judgment hearing, this interchange took place between the Court and Mr. Ward, counsel for Hyundai:

> The Court: Mr. Ward, I'm trying to articulate it the best I can. Is there anything in the four corners of the contract that would keep Hyundai or anyone else from imposing such a harsh, rigorous termination of the cap? Is there anything in there that would keep Hyundai from requiring Texas Instruments from making them prove it one by one? Just in the corners.
>
> Mr. Ward: Well, I think that the requirement to negotiate in good faith would prohibit that onerous burden, yes, Your Honor, I do.
>
> The Court: Well, that would be another issue, but—

Mr. Ward: I believe that's the only one that I know of that I could point to. There's no other one other than the requirement that the parties say that they will negotiate in good faith. And we don't believe, you know, that—we don't believe it leads to an absurd result, given our conduct prior to any litigation and the fact that 7.1, as I said, provides for the negotiation, renewal and good faith by both parties...But to answer your question, Your Honor, other than the requirement to negotiate in good faith over the renewal license, there is no express provision within the four contract that would prevent us from—

The Court: That's exactly the way I see it.

Mr. Ward: There is not a—

The Court: There is an opportunity to negotiate in good faith, but what you are telling me, there is no formula in the contract for either party to avoid the patent-by-patent, litigation-by-litigation, country-by-country approach. There's no formula that prohibits that, is there?

Mr. Ward: Not other than what I've just said. I have nothing else to point to you.

The Court: So it leaves it not to the good faith of the parties, obviously, to the good faith only of Hyundai. We know what TI's good-faith preference is. *But if it's Hyundai or anybody else, is it their good faith, their unilateral benevolence that allows them to either take it patent-by-patent or allows them to agree upon a formula outside of the contract words: in other words, come up with a different formula to approach the cap?*

Mr. Ward: Well, I think there's two things—I still say that it's important that you had a fixed term, that you didn't have to interpret into that. You did not have to try to terminate it earlier, as TI sought to do. You did not

---

**70.** Moreover, Article 5.7 militates against *inferring* or *implying* additional obligations necessary for the calculation of royalties. *See supra* note 60.

have to do that. But, you know, I'm not trying to mislead the court. *The court is correct that there isn't—other than the fact there was a fixed term, other than the fact that there was a contractual obligation to try to-to negotiate in good faith.* And I still believe it's admissible evidence, Your Honor, that we did in fact, prior to the institution of any litigation, identify the same countries that we—our expert has now identified. The Court: And if they refuse to accept those identities, what's the recourse?

Mr. Ward: Lawsuit ...

The Court: *Without a formula and without a subsequent agreement on negotiations and without a subsequent agreement on a workable formula, again, the contract provides neither this court nor anyone else with a formula to determine how to avoid the patent-by-patent, product-by-product, country-by-country approach? I don't know of any other way to avoid it.*

Mr. Ward: *Other than the requirement that I said we're having to do what we had to do in good faith.*[71]

*Summary Judgment Hearing Transcript* at 46:21–49:20 (emphasis added). Hyundai is taking Article 7.1 to bolster its "TI Country Concept" for this reason: the "TI Country Concept" renders the sales cap provision virtually useless. Hyundai argues that Article 7.1 provides the "good-faith" mechanism for interpreting (and subsequently enforcing) the sales cap provision, but that provision expressly provides for negotiations *after* termination of the License Agreement pursuant to the sales cap provision. Assuming, *arguendo*, that Article 7.1 does indeed provide a mechanism for determining what are "royalty bearing products" that count toward the sales cap calculation, Hyundai's interpretation still renders the sales cap provi-

sion useless absent a "definite agreement" resulting from "good-faith" negotiations about these specific terms. Finally, Hyundai says that all of this concern over Article 5.2(A)(ii), the sales cap provision, is really not that important since there is the fixed termination date of December 31, 2000. What Hyundai is really saying is: [Paraphrasing, of course] "Don't worry that the sales cap provision doesn't really work under our 'TI Country Concept' interpretation. We still have the fixed term that terminates the contract." Well, good for Hyundai; but that still renders an entire provision of the contract virtually useless—a nullity created by a provision within the very same contract it now sits, Article 7.1 and its "good-faith", negotiations.[72] Hyundai's "TI Country Concept" interpretation turns the License Agreement into a paradox—a self-contradicting contract that voids one of its own, key provisions.

### D. Article 7.9—Royalties Not Dependent Upon Patent Invalidation

Finally, Article 7.9 provides, in part:

For the convenience of the parties hereto, this Agreement is made in consideration of the exchange of patent licenses under a group of patents of each party. A determination or action by a court of competent jurisdiction, regulatory authority or governmental agency: (i) finding that one or more of the patents of one party are invalid; or (ii) granting a temporary or permanent injunction or restraining order under one or more of the patents; shall not give rise to a right of termination by either party *nor shall such determination or action be regarded as justification for a change in the royalty rates.*

---

**71.** Counsel for Hyundai, once again, candidly and accurately states Hyundai's position. Candor and accuracy are endangered species at hearings; it is nice to know that occasionally these curious beasts roam an environment that so desperately needs them.

**72.** Moreover, Hyundai still can enjoy its "royalty caps" under the License Agreement since the "good-faith" negotiations of Article 7.1 are not required for calculation of these fixed amounts. [Paraphrasing] "Well Texas Instruments, we get our caps but you lose yours," says Hyundai. Absurd.

*License Agreement* at 44 (emphasis added). Once again, the "TI Country Concept" flies in the face of the express language of the License Agreement. This provision that if any party's patents are either (i) found invalid, or (ii) proven up (that is, shown valid and infringed by litigation), the royalty remains the same. Texas Instruments urges this provision directly contradicts Hyundai's patent-by-patent "covered by" interpretation of the License Agreement since the calculation of royalties rests upon the definition of royalty bearing products. Hyundai responds that "TI offers no legal, factual or logical support for its tortured application of Article 9.1(c) of the interpretation of Article 5.2(A)(ii)." *Hyundai's Opposition Brief* at 23. Once again, Hyundai urges this Court to simply ignore the royalty provisions by arguing they are wholly unrelated to the sales cap calculation. Hyundai is wrong. Through their "TI Country Concept" interpretation of the License Agreement, "royalty bearing products" incorporates the "covered by" language that lies within the "License Products" article. *Article 1.20, License Agreement* at 11. Royalty bearing products effects sales cap and royalty calculations alike. Hyundai wards this Court off of the calculation of royalties since its tortured interpretation of royalty bearing products constantly inflicts violence upon unsuspecting provisions like Article 7.9 of the License Agreement.

### 11. Texas Instruments—Damned If It Does, and Damned If It Doesn't

This section explores the ultimate absurdity inherent in the "TI Country Concept" interpretation of the License Agreement. If Texas Instruments must sue Hyundai on each product, under each patent, under the patent laws of each particular country where Hyundai's sale occurs, then the License Agreement should provide a workable mechanism for this endeavor.[73] As previously noted, the License Agreement does *not* provide a workable formula for carrying out this product by product, patent by patent, country by country licensing scheme. Not only does the License Agreement fail to provide the parties a mechanism for proceeding under the "TI Country Concept," it actually *penalizes* Texas Instruments for attempting to establish (via litigation) a product as a "royalty bearing product" under Hyundai's interpretation. Here is how:

According to Hyundai, the License Agreement was still in effect on May 1, 1998 when Texas Instruments filed its initial patent infringement lawsuits. Article 7.2 of the License Agreement holds; in its entirety:

> 7.2 If a party fails to make any payment fully or timely as required by this Agreement, or in the event of *any other material breach* of this Agreement by either party or any of its SUBSIDIARIES sublicensed hereunder, and if such failure or other material breach is not corrected within forty-five (45) days after written notice complaining thereof is given to the defaulting party, then this Agreement may be terminated forthwith in its entirety by written notice to that effect from the complaining party, provided that such termination shall not

---

**73.** This Court has already discussed Hyundai's attempt to use "good-faith" negotiations as a possible cure to the product by product, patent by patent, country by country licensing scheme it urges this Court to endorse. This argument combines the audit provision, Article 6.1, with a wholly separate "good-faith" negotiations provision, Article 7.1. Simply put, an Article 6.1 audit could not perform the patent analysis necessary to establish validity and infringement. An Article 7.1 "good-faith" negotiation session is both inapplicable (it applies only *after* termination of the contract), and inherent within it lies its own failure since *both* parties must execute a "definitive agreement." Combination and application of these provisions would only lead to protracting the inevitable nullification of the License Agreement's sales cap termination clause. Moreover, using these two provisions to impose an additional, extrinsic obligation upon Texas Instruments for the receipt of its royalties flies in the face of Article 5.7 which militates against such an inferential obligation. *See supra* note 60.

affect any royalty of other obligation arising prior to such termination.

*License Agreement* at 40 (emphasis added). So, under Hyundai's "TI Country Concept" interpretation of the License Agreement and its "credit" of sales in only the United States, Japan, and Europe,[74] Texas Instruments *materially breached* the License Agreement by filing patent infringement.lawsuits while Hyundai "believed" it was still below the sales cap and protected by the contract. "Accordingly, on May 7, 1998, Hyundai gave Texas Instruments written notice that Texas Instruments was in material breach of the License Agreement and demanded that Texas Instruments *cure its breach by dismissing the pending patent infringement lawsuits* within the 45 day cure period." *Hyundai's Motion for Summary Judgment* at 9 (emphasis added). Obviously, Texas Instruments refused to dismiss the lawsuits. So, on July 6, 1998, Hyundai terminated the License Agreement pursuant to Article 7.2. Article 7.7 of the License Agreement provides, in its entirety:

> In the event of termination of this Agreement or any of the licenses granted under this Agreement, by one party ("the Terminating Party") *pursuant to Articles 7.2 or 7.3*, any licenses granted to the Terminating party pursuant to Article 3 and any sublicenses granted to any of its SUBSIDIARIES by the Terminating Party pursuant to Article 4, *shall survive until December 31, 2000.*

*License Agreement* at 43 (emphasis added). Therefore, Hyundai argues: 1) Texas Instruments committed a material breach of the License Agreement by filing these patent infringement lawsuits during the term of the License Agreement; 2) Hyun-

dai gave Hyundai written notice to cure this breach pursuant to Article 7.2 of the License Agreement; 3) Texas Instruments failed to cure this breach within the forty-five-day cure period provided for in Article 7.2 since it refused to dismiss these patent infringement lawsuits; 4) Pursuant to Article 7.2, Hyundai terminated the License Agreement on July 6, 1998; and, finally 5) Pursuant to Articles 7.2 and 7.7, Texas Instruments' rights under the License Agreement have terminated while Hyundai's rights under the License Agreement survive until December 31, 2000.[75] This rigid logic is actually antithetical to realization of the "TI Country Concept" interpretation of the License Agreement.

The "TI Country Concept" interpretation of the License Agreement puts the burden on Texas Instruments to prove each product as "covered by" a *valid* patent in the country in which Hyundai sells that particular product.[76] If Texas Instruments actually wins that particular lawsuit, then that product magically becomes a "royalty bearing product" and counts toward the sales cap calculation. So, assume that Texas Instruments wants to establish that a product in Malta is a "royalty bearing product" and thus applicable to the sales cap calculation. Texas Instruments' lawyers board a plane, fly to Malta,[77] and become experts on Maltese patent law. Confident they can win a Maltese verdict of infringement in a New York federal court pursuant to Article 9.11's forum selection clause, Texas Instruments' lawyers (eventually) board a plane for New York where they file a patent infringement lawsuit on that particular product under that particular patent sold by Hyundai in Mal-

---

**74.** To re-visit Hyundai's math regarding of the sales cap calculations under its "TI Country Concept" interpretation of the License Agreement, *see supra* pp. 664–665. Go ahead, choose your own adventure.

**75.** Aside from its request that this Court adopt its "TI Country Concept" interpretation of the License Agreement, this is, in essence, the relief sought by Hyundai in its motions currently pending before this Court.

**76.** This Court has twice dismissed Hyundai's "good-faith-negotiations-about-the-sales-cap" theory and will not credit this argument with more rebuttal (if any) than it needs.

**77.** Malta, whose capital is Valletta, is a small island in the Mediterranean nestled between Sicily and Africa. Considering its location, a trip there might not be *that* objectionable.

ta. Texas Instruments' lawyers win a Maltese verdict of infringement (delivered by a New York federal judge) against Hyundai (thereby establishing that particular product as a product "covered by" a *valid* Texas Instruments patent and thus a "royalty bearing product" applicable to the sales cap calculation).[78] Sun-tanned and victorious, the Texas Instruments lawyers would return to their home office only to find a letter from Hyundai notifying Texas Instruments that it is in "material breach" of the License Agreement and thus has a few days to cure. Even though Texas Instruments was playing under Hyundai's "TI Country Concept" interpretation of the License Agreement by actually establishing a product as "covered by" a *valid* Texas Instrument patent. Hyundai still manages to void the sales cap provision by declaring the patent infringement lawsuit a "material breach" of the License Agreement thereby terminating Texas Instruments' rights under the contract and nullifying the sales cap termination clause. That is, the "TI Country Concept" actually *discourages* Texas Instruments from suing and establishing a product as a royalty bearing product since filing that suit will (absent dismissal of the lawsuit) terminate Texas Instruments' rights under the License Agreement, thereby nullifying the entire sales cap provision.

So, Texas Instruments has two hopeless options under the "TI Country Concept" interpretation of the License Agreement. On the one hand, if Texas Instruments sits idly back and files no patent infringement lawsuits, the sales cap provision will never trigger since Texas Instruments has not established any products as "covered by" *valid* Texas Instruments patents and, thus, "royalty bearing products." On the other hand, if Texas Instruments plays Hyundai's game—that is, if Texas Instruments sues Hyundai on a particular prod-

uct, under a particular patent, under the patent laws of the particular country in which Hyundai makes the sale—then Texas Instruments forfeits its rights under the contract and loses the benefit of early termination since Hyundai can, pursuant to Articles 7.2 and 7.7, simply terminate the contract and continue using Texas Instruments products (without fear of excessive royalties) until December 31, 2000.[79] Not only is the "TI Country Concept" antithetical to its own success, but under Hyundai's interpretation of the License Agreement Texas Instruments is damned if it does and damned if it doesn't.

Once again, this Court will step back so as not to lose the forest for the trees. Hyundai gives Texas Instruments a Hobson's choice. Hyundai first tells Texas Instruments that the sales cap termination clause does not trigger until the parties execute a "definitive agreement" following "good-faith" negotiations about which products are "royalty bearing products" applicable to the sales cap calculation. Assuming, *arguendo,* that Article 7.1 applies to negotiations *before* the contract has terminated (and it does not), it nonetheless provides a mechanism whereby Hyundai can nullify the sales cap termination clause by simply refusing (in good faith, of course) to agree with Texas Instruments' interpretation of that provision. Under this option, the sales cap provision automatically nullifies. Next, Hyundai argues that the "TI Country Concept" interpretation of the contract requires Texas Instruments to prove each royalty bearing product as "covered by" a *valid* patent in force in the country in which the product is sold at the time the product is sold. But if Texas Instruments files any of these patent infringement lawsuits against Hyundai in an effort to establish a product as a royalty bearing product applicable to the

---

78. For the limited purposes of this hypothetical, assume that 1) Texas Instruments has a patent in Malta, and 2) the New York Federal court delivers an opinion in less than forty-five days of suit being filed (now that really is *notoriously* rapid).

79. This is precisely what Hyundai did in response to Texas Instruments' patent infringement lawsuits. Suddenly, this hypothetical doesn't seem so hypothetical.

sales cap calculation, Hyundai simply fires off a "material breach" letter demanding the lawsuit be dismissed (thus the "TI Country Concept" can, in fact, never be realized). And under this option, the sales cap provision automatically nullifies. Finally, Hyundai says Texas Instruments can just sit idly back and not file any infringement lawsuits and, absent a "definitive agreement" based on "good-faith" negotiations, the sales cap provision will lay dead in the contract. And yet again, this option nullifies the sales cap provision. Texas Instruments is damned if it does and damned if it doesn't.

Taking one further step back from the forest, this Court must note one last thing. Under *all* of Hyundai's "options" pursuant to its "TI Country Concept" interpretation of the License Agreement, the sales cap provision remains dead on arrival. Meanwhile, Hyundai's royalties remain "capped" pursuant to specified annual amounts. As previously noted, both Texas Instruments and Hyundai enjoy protection via their respective "caps" in the License Agreement: Texas Instruments has its sales cap termination clause and Hyundai has its royalty cap. Now, Hyundai attempts to "interpret" (through meandering, cross-referencing, and provision incorporation) Texas Instruments' sales cap into oblivion by rendering it null. Hyundai wants to strip Texas Instruments of its sales cap protection while remaining cloaked in the swaddling arms of its royalty cap. When this Court takes its final step back to see the forest for the trees, it notices Hyundai trying to burn a few of them off.

### 12. Sales by HEI and its Subsidiaries of Semiconductive Elements and Apparatus Count Toward the Sales Cap Calculation?

Intermittently throughout their briefs, Texas Instruments and Hyundai spar over the following issue: Which sales count toward the sales cap calculation? Sales by Hyundai Electronics, Limited? Or sales by both Hyundai Electronics, Limited and its subsidiaries? Article 5.2(A)(ii), the sales cap provision, specifically says "*HEI's* cumulative worldwide sales of royalty bearing products . . ." *License Agreement* at 30. Hyundai notes, and this Court concedes, that this provision does *not* say "HEI's and its SUBSIDIARIES' cumulative worldwide sales of royalty bearing products." Texas Instruments, on the other hand, argues that Article 5.6 [80] undermines this strict reading since it "expressly provides that only sales to third parties by either HEI *or* its subsidiaries count, and the intra-company sales *do not* count." *Texas Instruments Reply Brief* at 10, n. 10. All of this is academic; and this Court expressly refuses to rule simply for the sake of ruling. By Hyundai's own accounting, if this Court includes the "rest of world" countries that Hyundai erroneously excludes from the sales cap calculation, Hyundai, under its own calculations, was far over the termination cap as of May 1, 1998—the day Texas Instruments filed its initial patent infringement lawsuit. *See supra* pp. 664–665. Whether or not Hyundai's subsidiaries should be included in the sales cap calculation is a discussion for another day. Hyundai's own numbers generated under its own interpretation reveal a busted termination cap.

### 13. Conclusion

Hyundai strings together other excerpted provisions of the License Agreement in a valiant effort to defeat the express purpose of the license. However, upon closer analysis, these provisions simply cannot support the unreasonable interpretation it assigns to the fifty-page License Agreement. Hyundai's "TI Country Concept"

---

80. Article 5.6 reads, in its entirety:
ROYALTY BEARING PRODUCTS shall be deemed to be put into use, sold, leased, or otherwise disposed of, when billed by HEI, or a SUBSIDIARY of HEI, to a third party, or upon use, or incorporation into a product, by HEI or any of its SUBSIDIARIES, whichever event occurs first. Once royalty has been accounted for, for any ROYALTY BEARING PRODUCT, no further royalty shall be payable thereon under this Agreement.
*License Agreement* at 32.

interpretation, taken literally, results in the million-dollar licensing of absolutely nothing until Texas Instruments wins a verdict of infringement against Hyundai on a particular product, under a particular patent, under the patent laws of the particular country in which Hyundai's sale occurs. Hyundai's reach for good-faith negotiation provisions, muddled with excerpts from other, irrelevant provisions, represent the last efforts of a party flailing about trying to cling to anything to prevent the inevitable. By Hyundai's own numbers, the License Agreement was terminated on May 1, 1998—the day Texas Instruments initiated its infringement litigation.[81] The License Agreement terminated pursuant to the sales cap provision in Article 5.2(A)(ii). Game over, Hyundai.

This Court hereby makes the following findings:

1) the language of Article 5.2(A)(ii) (the "sales cap" provision) of the License Agreement is unambiguous;

2) Hyundai's proffered interpretation of Article 5.2(A)(ii) (the "sales cap provision") of License Agreement, the "TI Country Concept," is an unreasonable interpretation of that provision and the License Agreement;

3) the only reasonable interpretation of Article 5.2(A)(ii) of the License Agreement and the License Agreement is that "royalty bearing products" are all semiconductive elements and semiconductive apparatus other than discrete devices such as transistors, photo transistors, diodes and SCRs ("semiconductive resistors");

4) as of May 1, 1998, Hyundai's cumulative worldwide sales of royalty bearing products had exceeded the sales cap contained within Article 5.2(A)(ii) of the License Agreement;

5) since the sales cap provision of Article 5.2(A)(ii) (the "sales cap" provision) of the License Agreement had been reached as of May 1, 1998, the License Agreement had already terminated as of the day Texas Instruments initiated its patent infringement litigation.

Thus, this Court hereby GRANTS Plaintiff *Texas Instruments Incorporated's Motion for Partial Summary Judgment and Memorandum in Support Thereof* [83, 84, and 85 of 2:98–cv–74] and DENIES Defendant *Hyundai's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment* [67 of 2:98–cv–73].[82] The License Agreement terminated pursuant to its sales cap: and these cases are going to trial.

Accordingly, in the cases listed below this Court hereby DISMISSES WITH PREJUDICE the following:

1) 2:98–cv–73 — Count I entitled "Declaratory Relief re: Non–Termination of the License Agreement; Count II entitled "Declaratory Relief re: TI's Material Breach of License Agreement; and The "Fifth Affirmative Defense" (regarding the License Agreement).

2) 2:98–cv–74 — The "Fifth Affirmative Defense" (regarding the License Agreement).

3) 2:98–cv–77 — The "Fifth Affirmative Defense" (regarding the License Agreement).

4) 2:98–cv–223 — The "Third Affirmative Defense" (regarding the License Agreement);

5) 2:98–cv–224 — The "Third Affirmative Defense" (regarding the License Agreement); and

6) 2:98–cv–225 — The Affirmative Defense of License (regarding the License Agreement).[83]

It is SO ORDERED.

---

**81.** *See supra* pp. 665– 666.

**82.** At the "Evidentiary Hearing" held before this Court on February 4, 1999, counsel for Texas Instruments, Mr. Kenneth Adamo, succinctly described the trouble with Hyundai's various arguments it levies to support its "TI Country Concept" interpretation of the License Agreement: "... Hyundai's license defense, to try to figure out what the defense has been, when, and what the parameters are, if I can use an expression from my childhood, has been like trying to nail Jell–O to a wall." *Transcript of Evidentiary Hearing* at 89. This Court has felt similar frustration throughout

Hyundai's briefing and motions. Well Mr. Adamo, consider the Jell–O nailed.

83. In Case No. 2:99–cv–1, Hyundai is the plaintiff and there currently are no counter-claims. Thus, in this case, there currently is no affirmative defense of license to dismiss. Of course, this order would prohibit any such defense in Case No. 2:99–cv–1.