TERRY R. MEANS, UNITED STATES DISTRICT JUDGE
Pending before the Court is the Motion for Summary Judgment (doc. 46) filed by defendant/interpleader plaintiff Metropolitan Life Insurance Company ("MetLife") and interpleader plaintiff Metropolitan Tower Life Insurance Company ("MTLIC"), formerly known as Metropolitan Insurance and Annuity Company ("Metropolitan") (collectively, "the MetLife parties"). After review of the motion, related briefs, admissible evidence, and applicable *647 law, the Court concludes that the motion should be GRANTED.
I. Facts
Plaintiff Diane Weaver was formerly married to Larry Hickey. During the marriage, on or about July 4, 1989, Hickey was severely injured when diving into an apartment complex's swimming pool and was rendered a quadriplegic. As a result of that incident, the couple, who were represented by counsel, filed a lawsuit in state court against numerous entities that owned or operated the complex. A settlement was reached, and the parties executed a document entitled Release of All Claims ("the release"). The release provided that the couple relinquished all of their claims regarding the diving incident at the apartment complex for a total payment of $850,000. Of this total, $300,000 would be distributed to the Hickeys and their attorney, and the remaining $550,000 would be paid to MetLife "to purchase an annuity offered to the Hickeys." (Defs.' App. in Supp. of Mot. for Summ. J. (doc. 48) 19.)
Thereafter, the parties executed a Full and Final Release, Settlement and Indemnity Agreement ("the settlement agreement"). That document provided that the defendants' insurance carrier, Wausau Lloyds Insurance Company ("WLIC"), would pay the couple a total sum of $850,000.00, to be paid as follows:
• Lump Sums The following cash payments have been made to the respective claimants, receipt of which is hereby acknowledged:
$3000,000.00 [sic] Cash payment to Larry Hickey, Diane Hickey and Edward McAninch, for their benefit and the benefit of [their] attorneys.
• Periodic Payments
1. [WLIC] hereby agrees to make the following monthly payments to Larry Hickey :
The sum of two thousand four hundred and fifty dollars and forty-one cents ($2,450.41) on the first day (1st) of each and every month commencing May 1, 1992 and shall continue for the longer of the following two (2) time periods: i. until the death of Larry Hickey; or ii. for thirty (30) years (three hundred and sixty (360) monthly payments). With three percent (3.0%) annual compounding. If Larry Hickey dies before receiving all payments set forth in this paragraph, such payment shall be made as due to Diane Hickey, his wife, if living, otherwise to the Estate of Larry Hickey, upon proof of death being furnished to [WLIC], or its assignee. Claimant reserves the right to request to change the beneficiary of future periodic payments .
(Id. at 23-24.) This document was signed by Weaver on April 1, 1991. (Id. at 36.)
As a result of the settlement, WLIC and Metropolitan, MTLIC's predecessor in interest, entered into a Uniform Qualified Assignment ("the assignment") whereby WLIC assigned to Metropolitan all of its liability to make the periodic payments required under the settlement agreement. The assignment permitted the assignee to fund the periodic payments via purchase of an annuity from MetLife. The assignment designated Larry Hickey as the "Claimant." (Id. at 21.) Metropolitan retained all "rights of ownership and control" over the annuity. (Id. ) The assignment further provided that it "shall be binding upon the respective representatives, heirs, successors and assigns of the Claimant, the Assignor and the Assignee and upon any person or entity that may assert any right .... to any of the Periodic Payments." (Id. at 12.)
Metropolitan thus applied to MetLife for an annuity that would pay $2,450.41 per month, with three percent annual compounding, *648 for thirty years guaranteed and thereafter for as long as the annuitant lived. (Id. at 8-9.) The application named Larry Hickey as the "Measuring Life (Annuitant)" and further provided that the beneficiary would be "Diane Hickey, his wife, if living, otherwise to the Estate of Larry Hickey." (Id. at 8.)
As a result, MetLife issued the annuity. The annuity designated Larry Hickey as the measuring life and Metropolitan as the owner. Regarding the beneficiary, the annuity named "Diane Hickey, wife if living; otherwise the Estate of Larry Hickey." (Id. at 40.) The annuity provided that "[t]he Owner will have the right at any time to designate the payee, including the Beneficiary, to whom benefits are payable under the annuity. However, unless the Owner otherwise directs, Metropolitan will make all payments under the annuity to the person(s) named in the certificate." (Id. at 41.)
Several years later, Weaver initiated a divorce action against Hickey. An Agreed Final Decree of Divorce was issued on April 30, 1999. That decree divided the couple's assets but did not specifically mention the periodic payments under the annuity.
On January 22, 2002, Hickey requested the paperwork he might need "to change my benficiary [sic] from Diane Hickey to James M. Perry." (Id. at 44.) Perry is Hickey's brother. (Id. at 52.) MetLife returned the necessary paperwork to Hickey by letter dated January 24. The letter noted that "[t]his form will need to be signed by the OWNER and/or ASSIGNOR in order for this change to be effective unless the assignor has previously agreed to allow you to change the beneficiary.... Your request is not effective now and will not become effective unless and the until the owner signs the form." (Id. at 45.)
Hickey signed the required form on January 30, requesting that the beneficiary be changed to Perry. MetLife received the form in February 2002, noted that although the owner of the annuity was Metropolitan and the assignment did not have a beneficiary-change provision, the settlement agreement did and "[t]here is an indication that the payee is involved in a divorce proceeding." (Id. at 47.) As a result, MetLife notified Hickey by letter dated May 25, 2002, that it had changed the beneficiary in accordance with his wishes. (Id. at 50.)
Hickey passed away on November 14, 2014. (Id. at 53.) Perry submitted a copy of Hickey's death certificate and a letter noting that he was the beneficiary of the annuity and requesting that all future payments and correspondence be directed to him. (Id. at 52.) As a result, on December 1, 2014, MetLife commenced making the periodic payments to Perry, which had increased to $4,695.23 monthly.
As a result, on October 15, 2016, Weaver instituted this action. Weaver's Third Amended Complaint asserts a breach-of-contract claim against the MetLife parties due to their alleged "breach[ of] the Settlement Agreement by failing to make periodic annuity payments to [Weaver} as agreed and mandated thereunder" and also seeks a declaratory judgment. (Third Am. Compl. (doc. 44) 5, ¶ 16.) The MetLife parties now seek summary judgment.
II. Summary-Judgment Standard
When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." Bazan v. Hidalgo Cnty. , 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law."
*649 Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is required to consider only the cited materials, it may consider other materials in the record. See Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56"does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." Skotak v. Tenneco Resins, Inc. , 953 F.2d 909, 915-16 & n.7 (5th Cir.), cert. denied , 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Instead, parties should "identify specific evidence in the record, and ... articulate the 'precise manner' in which that evidence support[s] their claim." Forsyth v. Barr , 19 F.3d 1527, 1537 (5th Cir. 1994).
III. Analysis
The parties essentially dispute the legal effect of the documents at issue. "Summary judgment is particularly appropriate in cases where the language of a contract is unambiguous and only the interpretation of the contract in light of state substantive law is in dispute." Tex. Instruments, Inc. v. Hyundai Elec. Indus. Co., Ltd. , 42 F.Supp.2d 660, 669-70 (E.D. Tex. 1999). Because the Court exercises diversity subject-matter jurisdiction over these claims, Texas substantive law applies. See Gonzalez v. Denning , 394 F.3d 388, 392 (5th Cir. 2004) ("As this is a diversity case, we interpret the contract at issue under Texas law."). Under the law of Texas,
the interpretation of an unambiguous contract is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. If, however, the language of the contract is subject to two or more reasonable interpretations or meanings, it is ambiguous. A contract is not ambiguous merely because the parties to an agreement proffer conflicting interpretations of a term.
Under Texas law, the primary concern of a court construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. In construing a contract under Texas law, courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless. The terms used in the [contract] are given their plain, ordinary meaning unless the [contract] itself shows that the parties intended the terms to have a different, technical meaning.
Gonzalez , 394 F.3d at 392 (quotations and footnotes omitted).
After reviewing the documents at issue, the Court agrees with the MetLife parties that Hickey had the sole right, prior to his death, to change the beneficiary of the periodic payments. The settlement agreement signed by Weaver unambiguously gave Hickey that right. The agreement specifically provides that "[c]laimant reserves the right to request to change the beneficiary of future periodic payments." (Defs.' App. in Supp. of Mot. for Summ. J. (doc. 48) 24.)
*650 Weaver makes much of the fact that the agreement does not define the word "claimant," that the plain definition of claimant is "one that asserts a claim," and that she also was a "claimant" in the underlying lawsuit, having alleged and released a claim for loss of consortium. (Resp. Br. (doc. 56) 13.) While that may be true, it is of no moment in interpreting the unambiguous change-of-beneficiary provision in the settlement agreement. This provision is included in a paragraph discussing the periodic payments to be made solely to Larry Hickey . As previously indicated, the beginning of the paragraph states that WLIC "hereby agrees to make the following monthly payments to Larry Hickey ." (Defs.' App. in Supp. of Mot. for Summ. J. (doc. 48) 23.) Thus, the reference to "claimant" at the end of that paragraph unambiguously refers back to prefatory language at the beginning of the same paragraph regarding the recipient of the periodic payments: Larry Hickey. This language simply is not susceptible to more than one reasonable interpretation.
Furthermore, other language in the settlement agreement supports the conclusion that Larry Hickey, alone, was intended when the word "claimant" was used in the beneficiary-designation provision. For example, the settlement agreement also provides, in a section titled "Nonassignment by Claimant" that "[t]he periodic payments to be received by Claimant pursuant to [the] Periodic Payments [section of the agreement] are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge or encumbrance by Claimant." (Id. at 26 (emphasis added).) The periodic-payments section of the agreement specifically denotes that Larry Hickey, alone, is the recipient of the periodic payments.
Weaver also complains that "[t]he certificate of annuity indicates that MTLIC, as owner of the annuity, had the right at any time to change the beneficiary[, and that] Larry Hickey possessed no similar right." (Resp. Br. (doc. 56) at 10.) Weaver notes that the MetLife form Hickey signed to initiate the beneficiary change is not signed by either WLIC or MTLIC. (Id. at 11.) But that signature line on the form indicates that it is "[t]o be completed by Assignor, Assignee and Claimant (if applicable )." (Defs.' App. in Supp. of Mot. Summ. J. (doc. 48) 46 (emphasis added).) The letter MetLife returned to Hickey with the change-of-beneficiary form advised him that the form would have to be signed by either MTLIC or WLIC "unless [WLIC] has previously agreed to allow you to change the beneficiary." (Id. at 45.) MetLife apparently concluded that obtaining those signatures was not required given that the settlement agreement signed by WLIC, Hickey, and Weaver already gave Hickey the sole right to change the contingent beneficiary of his periodic payments. In any event, Weaver was not a party to the annuity and, as a contingent beneficiary, does not have "standing ... to insist upon strict or substantial compliance with policy requirements for a change of beneficiary." Fid. Union Life Ins. Co. v. Methven , 162 Tex. 323, 346 S.W.2d 797, 799 (1961).
Finally, Weaver submits her declaration to explain the "circumstances surround[ing] the parties' entry into the settlement agreement." (Resp. Br. (doc. 56) 16.) In the declaration, she suggests that "[a]t the time we settled the lawsuit ... [w]e ... agreed that Larry would receive all of the annuity payments until he dies, then they would be directed to me." (Pl.'s App. (doc. 56-1) 13, ¶ 11.) While that may have been their understanding at the time, the documents Weaver signed gave Hickey the right to change the beneficiary at any time during his lifetime. Her declaration cannot now be considered under the guise of explaining the circumstances surrounding *651 the parties' agreement to vary the unambiguous terms of that agreement.
III. Conclusion
For the foregoing reasons, the MetLife parties Motion for Summary Judgment (doc. 46) is GRANTED. Judgment will be entered in the MetLife parties' favor regarding Weaver's claim against them and their counterclaim against Weaver.